## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> U.S. Department of Justice ) <br> Antitrust Division ) <br> 1401 H Street, N.W., Suite 3000 ) <br> Washington, D.C. 20530 ) <br> ) <br>        *Plaintiff,* ) <br> ) <br>     v. ) <br> ) <br> MITTAL STEEL COMPANY N.V., ) <br> Hofplein 20, 15th Floor ) <br> Rotterdam, The Netherlands, 3032 ) <br> ) <br> ) <br>        *Defendant.* ) <br> ) | Case No. <br><br> JUDGE: <br><br> DECK TYPE: Antitrust <br><br> DATE STAMP: |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action to obtain equitable and other relief against the defendant, Mittal Steel Company N.V. ("Mittal Steel"), to prevent its proposed acquisition of Arcelor S.A. ("Arcelor"), and alleges as follows:

### I.

### NATURE OF THE ACTION

1.     Mittal Steel formally launched a tender offer for Arcelor on May 19, 2006, and on June 25, 2006 the Arcelor board recommended Mittal's offer to Arcelor's shareholders. The acceptance period for Mittal's tender offer closed on July 13, 2006, and Mittal Steel can take ownership of the shares beginning on August 1, 2006.

2.    Mittal Steel is an integrated steelmaker that manufactures, among other products, finely rolled tin or chrome coated steel sheets known as "Tin Mill Products." Tin Mill Products are used in manufacturing steel cans for packaging a wide range of food products such as soup, fruits, and vegetables, and non-food products such as paints, aerosols, and shaving cream. Mittal Steel is the second largest supplier of Tin Mill Products to the portion of the United States east of the Rocky Mountains (the "Eastern United States"), accounting for about 31 percent of Tin Mill Products tonnage sold in 2005.

3.    Arcelor accounted for about two percent of Tin Mill Products tonnage sold in the Eastern United States in 2005. Arcelor acquired its subsidiary Dofasco Inc. ("Dofasco") in February 2006. In 2005 Dofasco accounted for an additional four percent of the Tin Mill Products tonnage sold in 2005 in the Eastern United States.

4.    Mittal Steel's proposed acquisition of Arcelor would eliminate Arcelor, including its subsidiary Dofasco, as an independent competitor in the sale of Tin Mill Products in the Eastern United States, further consolidating an already highly concentrated market. The largest supplier of Tin Mill Products sold in the Eastern United States, another integrated steelmaker, accounted for over 44 percent of the tons sold in 2005. If this merger were not enjoined, the two largest suppliers of Tin Mill Products would account for over 81 percent of 2005 sales in the Eastern United States.

5.    The acquisition would remove current constraints on coordination and increase the incentives of the two largest firms to coordinate their behavior. The acquisition would thus substantially increase the likelihood of coordination and would likely lead to higher prices, lower quality, less innovation, and less favorable delivery terms in the Tin Mill Products market in the

2

Eastern United States.

6.      Accordingly, the acquisition would substantially lessen competition in Tin Mill

Products in the Eastern United States, in violation of Section 7 of the Clayton Act.

## II.

### JURISDICTION AND VENUE

7.      Plaintiff United States brings this action against defendant Mittal Steel under

Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain the violation

by defendant of Section 7 of the Clayton Act, 15 U.S.C. § 18.

8.      Defendant manufactures and sells Tin Mill Products in the flow of interstate

commerce.  Defendant's activities in developing, manufacturing and selling Tin Mill Products

substantially affect interstate commerce.  This Court has subject matter jurisdiction over this

action and the defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and

28 U.S.C. §§ 1331, 1337(a), and 1345.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(d).  Furthermore,

defendant has consented to venue and personal jurisdiction in this judicial district.

## III.

### PARTIES TO THE PROPOSED TRANSACTION

10.     Defendant Mittal Steel is a Netherlands corporation with its corporate

headquarters and principal place of business in Rotterdam, The Netherlands, and operations in

sixteen countries on four continents.  Mittal Steel produces both flat and long steel products for

all of the major steel consuming sectors, including automotive, appliance, machinery, and

construction.  Mittal Steel's total worldwide revenues exceeded $28 billion in 2005, and its total

3

annual steel production exceeded 55 million tons.  Mittal Steel produces Tin Mill Products in

Sparrows Point, Maryland and Weirton, West Virginia.  In 2005, Mittal Steel sold over 800,000

tons of Tin Mill Products in the Eastern United States.

11.     Arcelor is a Luxembourg corporation with its corporate headquarters and

principal place of business in the City of Luxembourg.  Arcelor, with operations primarily in

Europe and Brazil, produces flat and long products for the automotive, appliance, packaging, and

general industries.  In 2005, Arcelor had approximately $41.5 billion in total worldwide revenues

and steel production of 46 million tons.

12.     In February 2006 Arcelor acquired Dofasco, a wholly-owned Canadian subsidiary

with its corporate headquarters and principal place of business in Hamilton, Ontario, Canada.

Dofasco shipped 4.8 million tons of steel and had $3.9 billion in revenues in 2005.  Arcelor,

which shipped Tin Mill Products to the Eastern United States primarily from its European

facilities, and Dofasco, which shipped Tin Mill Products to the Eastern United States from its

Canadian facility, sold a combined 170,615 tons of Tin Mill Products in the Eastern United

States in 2005.

## IV.

### THE PROPOSED TRANSACTION

13.     On January 27, 2006, Mittal Steel announced its intention to launch a hostile

tender offer to acquire Arcelor for approximately $23 billion in cash and securities.  Mittal Steel

simultaneously announced an agreement to sell Dofasco for approximately $5 billion to a

German steelmaker, ThyssenKrupp A.G. ("ThyssenKrupp"), if Mittal Steel acquired Arcelor.

Arcelor initially resisted the hostile takeover.  One of the steps Arcelor's Board of Directors took

to resist the takeover was to transfer legal title to the shares of Dofasco to an independent Dutch foundation known as a "stichting."

14.    Mittal Steel subsequently increased its tender offer to approximately $33 billion in cash and securities and formally launched its tender offer on May 19, 2006.  After Mittal Steel agreed to improve the financial, corporate governance, and other terms of its offer for Arcelor, the Arcelor Board agreed on June 25, 2006 to recommend Mittal's offer to Arcelor's shareholders.  The acceptance period for Mittal's initial tender offer, during which 92.6 percent of Arcelor's shares were tendered, closed on July 13, 2006.  Mittal Steel can take ownership of the shares beginning on August 1, 2006.

## V.

## TRADE AND COMMERCE

### A.    Relevant Product Market

15.    Tin Mill Products are finely rolled steel sheets, usually coated with a thin protective layer of tin or chrome.  Tin Mill Products are manufactured using a sequence of processing steps in which steel is rolled into successively thinner sheets, then hardened, and finally coated with either tin or chrome.

16.    Tin Mill Products are comprised of three types of steel:  black plate, electrolytic tin plate ("ETP"), and tin free steel ("TFS").  Black plate is a light-gauge cold-rolled bare steel sheet that serves as the substrate for production of both ETP and TFS and can be used bare for some applications, such as pails or larger containers.  Black plate is coated with tin to produce ETP and with chrome to produce TFS.  ETP and TFS are both used for packaging, although each provides different advantages and disadvantages (including, *inter alia*, organic coating

acceptance, strength, surface finish and formability) that are considered by purchasers in making their purchase decisions.

17.    The majority of Tin Mill Products shipments are used to produce sanitary cans, often referred to as food cans. Other uses include aerosol cans, general line cans, pails, larger containers, metal buildings, and oil and fuel filter sheets.

18.    For most Tin Mill Products purchasers, including downstream food can customers, there are no close substitutes for Tin Mill Products. Packaging alternatives, such as plastic containers, are generally not viewed by can customers as replacements for products normally packaged in cans because of cost differences and the performance advantages associated with cans. Some of the advantages of steel cans compared to alternative packaging include their longer shelf life and greater durability, familiarity, and security. Alternative packaging generally costs at least as much as a steel can and sometimes costs as much as eight times as much as a can, and significant additional capital investments are necessary to incorporate alternative packaging materials into a customer's packaging process.

19.    A small but significant increase in the price of Tin Mill Products would not cause can manufacturers or their downstream customers to substitute non-Tin Mill Products containers, or otherwise to reduce their purchases of Tin Mill Products, in sufficient quantities so as to make such a price increase unprofitable. The use of alternative packaging containers is driven primarily by capital equipment investment considerations and by marketing factors such as consumer convenience, rather than by small but significant changes in the prices of Tin Mill Products. For example, can customers often use alternative packaging in order to extend an existing product line, such as using alternative materials for portable microwavable containers for

6

soup, while continuing to package the bulk of soup products in steel cans.

20.    Accordingly, the development, manufacture, and sale of Tin Mill Products is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**B.    Relevant Geographic Market**

21.    The Eastern United States is a geographically distinct market for the sale of Tin Mill Products. The only Tin Mill Products manufacturer in the United States west of the Rocky Mountains (the "Western United States") is located in California, and it does not have substantial sales in the Eastern United States due to its distance from can manufacturers in that part of the country, which tend to be located in proximity to agricultural regions. That California Tin Mill Products manufacturer, half owned by one of the two largest Tin Mill Products producers in the Eastern United States, accounts for over 84 percent of the Tin Mill Products sold in the Western United States but ships only small quantities to the Eastern United States. Similarly, Tin Mill Products producers in the Eastern United States generally do not sell significant quantities in the Western United States because their freight costs are higher than those of the single manufacturer located in the Western United States.

22.    A small but significant increase in the price of Tin Mill Products would not cause Tin Mill Products customers in the Eastern United States to substitute purchases from outside of the Eastern United States in sufficient quantities so as to make such a price increase unprofitable.

23.    Accordingly, the Eastern United States is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

C.    **Anticompetitive Effects**

24.    Currently, Mittal Steel and its primary competitor account for over 75 percent of Tin Mill Products sales in the Eastern United States. Were Mittal Steel to acquire Arcelor, the largest two firms would account for over 81 percent of such sales. In 2005, Mittal Steel, Arcelor, Dofasco, and one other firm sold more than 2.1 million tons of Tin Mill Products in the Eastern United States.

25.    The market for Tin Mill Products in the Eastern United States would thus become substantially more concentrated if Mittal Steel were to acquire Arcelor and its Dofasco subsidiary. Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI") (defined and explained in Appendix A), the proposed transaction will increase the HHI in the market for Tin Mill Products in the Eastern United States by approximately 412 points to a post-acquisition level of approximately 3,522, well in excess of levels that raise significant antitrust concerns.

26.    Purchasers of Tin Mill Products in the Eastern United States have benefitted from competition between Mittal Steel and Arcelor through lower prices, higher quality, more innovation, and better delivery terms for Tin Mill Products. Arcelor and its subsidiary Dofasco are known for high quality and innovation, which forces Mittal Steel and other domestic producers to compete on these aspects as well. By acquiring Arcelor, Mittal Steel would eliminate that competition.

27.    Mittal Steel's elimination of Arcelor as an independent competitor in the manufacture and sale of Tin Mill Products within the Eastern United States is likely to facilitate anticompetitive coordination among the two major Tin Mill Products manufacturers by making

8

such coordination more profitable and harder to defeat.  If the two largest Tin Mill Products firms

in the Eastern United States were to seek to raise prices or reduce output today, purchasers of Tin

Mill Products could purchase Tin Mill Products from Arcelor and its subsidiary Dofasco.

Arcelor has substantial excess and divertible capacity in Europe, and Arcelor's Dofasco

subsidiary has significant divertible capacity in Canada.  Were Arcelor and Dofasco no longer

available as independent suppliers, the remaining domestic and foreign fringe producers would

likely not have sufficient capacity and/or incentives to increase production enough to defeat an

anticompetitive price increase or output reduction by the two largest firms.  In particular, the only

other incumbent producer located in the Eastern United States does not have the ability to

manufacture cold-rolled substrate, and its ability to obtain the additional substrate needed to

increase its output is constrained.

     **D.**     **Entry and Expansion**

     28.     De novo entry into the development, manufacture and sale of Tin Mill Products is

difficult, time-consuming, and costly, and such entry would not be timely, likely, or sufficient to

defeat coordination by the two largest Tin Mill Products firms in the Eastern United States post-

merger.  To produce Tin Mill Products, a firm needs a reliable source of cold-rolled substrate and

a Tin Mill Products finishing facility.  A facility to finish cold-rolled substrate into Tin Mill

Products would likely cost in the range of $60 to $100 million and take approximately two years

to design and build.  In addition, entry by a firm that lacks the ability to manufacture cold-rolled

substrate or to increase its output of cold-rolled substrate would be more risky as it may not gain

access to sufficient substrate to compete effectively.  The cost of entry is largely "sunk," *i.e.*, it

cannot be recovered or converted to other uses, raising the risk to entry, and there is a very high

risk that a new entrant may not receive any profits from its entry.

29.     Significant new foreign entry or expansion of shipments to the Eastern United States by existing foreign producers is unlikely due to longer delivery lead times occasioned by the need for oceangoing transportation, additional shipping costs, trade barriers, the possibility of future import restrictions, and the reluctance of foreign Tin Mill Products manufacturers to abandon existing markets elsewhere in order to enter or expand in the Eastern United States. Overseas shipping increases the time between order and delivery by up to four months, which is unacceptable for most customers in the Eastern United States because their demand requirements fluctuate with hard-to-predict fruit and vegetable harvests.  Capacity constraints also limit certain foreign producers from expanding their sales into the Eastern United States.

30.     Therefore, entry or expansion by any other firm into the Eastern United States Tin Mill Products market would not be timely, likely, or sufficient to deter post-acquisition coordination.

## VI.

## VIOLATION ALLEGED

31.     The effect of the proposed acquisition of Arcelor by Mittal Steel would be to substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

32.     Unless restrained, the transaction will likely have the following effects, among others:

      a.     competition generally in the development, manufacture and sale of Tin Mill Products in the Eastern United States would be substantially lessened;

b.      actual and potential competition between Mittal Steel and Arcelor in the

development, manufacture and sale of Tin Mill Products will be

eliminated; and

c.      the prices for Tin Mill Products will likely increase, the quality of Tin Mill

Products will likely decline, innovation relating to Tin Mill Products will

likely decline, and the delivery terms currently offered in the Tin Mill

Products market will likely become less favorable to customers.

## VII.

## **REQUESTED RELIEF**

33.    Plaintiff requests that:

a.      Mittal Steel's proposed acquisition of Arcelor be adjudged and decreed to

be unlawful and in violation of Section 7 of the Clayton Act,

15 U.S.C. § 18;

b.      defendant and all persons acting on its behalf be permanently enjoined and

restrained from consummating the proposed acquisition or from entering

into or carrying out any contract, agreement, plan, or understanding, the

effect of which would be to combine Mittal Steel with the operations of

Arcelor;

c.      plaintiff be awarded its costs for this action; and

d.      plaintiff receive such other and further relief as the case requires and the

Court deems just and proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:


Thomas O. Barnett
Assistant Attorney General
D.C. Bar #426840


David L. Meyer
Deputy Assistant Attorney General
D.C. Bar #414420


J. Robert Kramer II
Director of Operations


Maribeth Petrizzi
Chief, Litigation II Section
D.C. Bar #435204


Robert W. Wilder
Acting Assistant Chief, Litigation II Section


Kerrie J. Freeborn
John F. Greaney
Stephen A. Harris
Lowell Stern (D.C. Bar #440487)
Attorneys
U.S. Department of Justice
Antitrust Division, Litigation II Section
1401 H Street, N.W., Suite 3000
Washington, D.C.  20530
(202) 307-0924


Dated: August 1, 2006

## APPENDIX A

## HERFINDAHL-HIRSCHMAN INDEX CALCULATIONS

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of thirty, thirty, twenty, and twenty percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 =$ 2600). The HHI takes into account the relative size and distribution of the firms in a market and approaches zero when a market consists of a large number of firms of relatively equal size. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated and those in which the HHI is in excess of 1800 points are considered to be highly concentrated. Transactions that increase the HHI by more than 100 points in highly concentrated markets presumptively raise antitrust concerns under the *Horizontal Merger Guidelines* issued by the U.S. Department of Justice and the Federal Trade Commission. *See Horizontal Merger Guidelines* § 1.51.