UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>MITTAL STEEL COMPANY N.V.,<br><br>*Defendant.* | Case No.<br><br>JUDGE:<br><br>DECK TYPE: Antitrust<br><br>DATE STAMP: |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

I.

## NATURE AND PURPOSE OF THE PROCEEDING

The United States filed a civil antitrust Complaint on August 1, 2006, seeking to obtain equitable and other relief against defendant Mittal Steel Company N.V. ("Mittal Steel") to prevent its proposed acquisition of Arcelor S.A. ("Arcelor"). Mittal Steel and Arcelor, including its Canadian subsidiary Dofasco Inc. ("Dofasco" or the "Dofasco Business"), are two of only a limited number of suppliers to the portion of the United States east of the Rocky Mountains (the "Eastern United States") of finely rolled tin or chrome coated steel sheets ("Tin Mill Products"). Tin Mill Products are used in manufacturing steel cans for packaging a wide range of food

products, such as soup, fruits, and vegetables, and non-food products, such as paints, aerosols, and shaving cream. The Complaint alleges that the likely effect of this acquisition would be to lessen competition substantially in the development, manufacture and sale of Tin Mill Products in the Eastern United States, in violation of Section 7 of the Clayton Act. This loss of competition would likely result in higher prices, lower quality, less innovation, and less favorable delivery terms to customers in the Eastern United States Tin Mill Products market.

At the same time the Complaint was filed, the United States filed a Hold Separate Stipulation and Order and a proposed Final Judgment. These are designed to remedy the anticompetitive effects of the acquisition while permitting Mittal Steel to complete its acquisition of Arcelor. Under the proposed Final Judgment, which is explained more fully below, the defendants are required to divest certain assets including Arcelor's Dofasco subsidiary to ThyssenKrupp AG ("ThyssenKrupp"), a German corporation with its headquarters in Dusseldorf, Germany, or, if defendant chooses, to another acquirer of the divested business ("Acquirer") acceptable to the United States in its sole discretion. If the defendant is unable to sell the Dofasco Business to ThyssenKrupp or an alternative acceptable buyer, then the defendant is required to divest, at the United States's option, either Mittal Steel's Sparrows Point, Maryland, facility ("Sparrows Point Business") or Mittal Steel's Weirton, West Virginia, facility ("Weirton Business") to an Acquirer acceptable to the United States in its sole discretion (with the business so selected referred to as the "Selected Business") . The divestiture of either the Dofasco Business or the Selected Business is designed to enable the Acquirer to become a viable and active competitor in the Eastern United States Tin Mill Products market.

The United States and defendant have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate

this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

II.

DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

*A.    The Defendant and the Proposed Transaction*

Mittal Steel, a Netherlands corporation, has its corporate headquarters and principal place of business in Rotterdam, The Netherlands, and has operations in sixteen countries, located on four continents. As one of the largest steel producers in the world, Mittal Steel is primarily engaged in making a variety of steel products for all the major steel consuming sectors, including automotive, appliance, machinery, and construction. Among its many steel product lines is Tin Mill Products. In 2005, Mittal Steel reported total worldwide revenues that exceeded $28 billion and total annual steel production that exceeded 55 million tons. Mittal Steel maintains seventeen production facilities within the United States, and produces Tin Mill Products in Sparrows Point and Weirton. Mittal Steel operates in the United States through its wholly-owned subsidiary Mittal Steel USA, located in Chicago, Illinois, which markets and sells in the United States Tin Mill Products and other products manufactured by Mittal Steel. Tin Mill Products manufactured at Mittal Steel's U.S. tin mills are shipped primarily to customers in the United States. In 2005, Mittal Steel sold over 800,000 tons of Tin Mill Products in the Eastern United States.

Arcelor, a Luxembourg corporation, has its corporate headquarters and principal place of business in the City of Luxembourg. Like Mittal Steel, Arcelor is one of the world's largest steel producers and makes a variety of steel products for the automotive, appliance, packaging, and other industries. In 2005, Arcelor reported total worldwide revenues of approximately $41.5 billion and steel production of 46 million tons. In February 2006, Arcelor acquired Dofasco, a

wholly-owned Canadian subsidiary with its principal place of business in Hamilton, Ontario, Canada. In 2005, Dofasco shipped 4.8 million tons and had $3.9 billion in revenues. Among Arcelor's many steel product lines is Tin Mill Products, which it makes at mills in Europe and Brazil and at Dofasco's Hamilton mill. In 2005, Arcelor, which shipped Tin Mill Products to the Eastern United States primarily from its European facilities, and Dofasco, which shipped Tin Mill Products to the Eastern United States from its Canadian facility, sold a combined 170,615 tons of Tin Mill Products in the Eastern United States.

On January 27, 2006, Mittal Steel announced its intention to launch a hostile tender offer to acquire Arcelor for approximately $23 billion in cash and securities. Mittal Steel simultaneously announced an agreement to sell Dofasco for approximately $5 billion to ThyssenKrupp if Mittal Steel acquired Arcelor. Arcelor initially resisted the hostile takeover. One of the steps Arcelor's Board of Directors took to resist the takeover was to transfer legal title to the shares of Dofasco to an independent Dutch foundation known as a "stichting."

Mittal Steel subsequently increased its tender offer to approximately $33 billion in cash and securities and formally launched its tender offer on May 19, 2006. After Mittal Steel agreed to improve the financial, corporate governance, and other terms of its offer for Arcelor, the Arcelor Board agreed on June 25, 2006 to recommend Mittal Steel's offer to Arcelor's shareholders. The acceptance period for Mittal's initial tender offer, during which 92.6 percent of Arcelor's shares were tendered, closed on July 13, 2006. Mittal Steel can take ownership of the shares beginning on August 1, 2006.

Mittal Steel's acquisition of Arcelor would, among other things, combine the operations of two significant providers of Tin Mill Products in the Eastern United States. The United States alleges in its Complaint that this proposed transaction would lessen competition substantially in

the market for Tin Mill Products in the Eastern United States, in violation of Section 7 of the Clayton Act.

    **B.**    *The Competitive Effects of the Transaction on the Tin Mill Products Market*

        *1.*    *Relevant Product Market: The Development, Manufacture and Sale of Tin Mill Products*

The Complaint alleges that the development, manufacture and sale of Tin Mill Products is a relevant product market within the meaning of Section 7 of the Clayton Act. Tin Mill Products are finely rolled steel sheets, usually coated with a thin protective layer of tin or chrome. Tin Mill Products are manufactured using a sequence of processing steps in which steel is rolled into successively thinner sheets, then hardened, and finally coated with either tin or chrome. Tin Mill Products are comprised of three types of steel: black plate, electrolytic tin plate ("ETP"), and tin free steel ("TFS"). Black plate is a light-gauge cold-rolled bare steel sheet that serves as the substrate for production of both ETP and TFS and can be used bare for some application such as pails or larger containers. Black plate is coated with tin to produce ETP and with chrome to produce TFS. ETP and TFS are both used in packaging, although each provides different advantages and disadvantages (including, *inter alia*, organic coating acceptance, strength, surface finish, and formability) that are considered by purchasers in making their purchase decisions. The majority of Tin Mill Products are used to produce sanitary cans, often referred to as food cans. Other uses include aerosol cans, general line cans, pails, larger containers, metal buildings, and oil and fuel filter sheets.

For most Tin Mill Products purchasers, including downstream food can customers, there are no close substitutes for Tin Mill Products. Packaging alternatives, such as plastic containers, are generally not viewed by can customers as replacements for products normally packaged in

cans because of cost differences and the performance advantages associated with cans. Some of the advantages of steel cans compared to alternative packaging include their longer shelf life and greater durability, familiarity, and security. Alternative packaging generally costs at least as much as a steel can and sometimes costs as much as eight times as much as a can, and significant additional capital investments are necessary to incorporate alternative packaging materials into a customer's packaging process.

The Complaint alleges that a small but significant increase in the price of Tin Mill Products would not cause can manufacturers or their downstream customers to substitute non-Tin Mill Products containers or otherwise to reduce their purchases of Tin Mill Products in sufficient quantities so as to make such a price increase unprofitable. The use of alternative packaging containers is driven primarily by capital equipment investment considerations and by marketing factors such as consumer convenience, rather than by small but significant changes in the prices of Tin Mill Products. For example, can customers often use alternative packaging in order to extend an existing product line, such as using alternative materials to package soup in portable microwavable containers, while continuing to package the bulk of their soup products in steel cans. Accordingly, the Complaint alleges that the development, manufacture, and sale of Tin Mill Products is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

2.   *Relevant Geographic Market: Eastern United States*

The Complaint also alleges that the Eastern United States is a geographically distinct market for the sale of Tin Mill Products. The only Tin Mill Products manufacturer in the United States west of the Rocky Mountains (the "Western United States") is located in California, and it does not have substantial sales in the Eastern United States due to its distance from can

manufacturers in that part of the country, which tend to be located in proximity to agricultural regions. The California Tin Mill Products manufacturer, which is half owned by one of the two largest Tin Mill Products producers in the Eastern United States, accounts for more than 84 percent of the Tin Mill Products sold in the Western United States but ships only small quantities to the Eastern United States. Similarly, Tin Mill Products producers in the Eastern United States generally do not sell significant quantities in the Western United States because their freight costs are higher than those of the single manufacturer located in the Western United States.

Customers are reluctant to rely on offshore suppliers of Tin Mill Products for their general production requirements. More than 89 percent of Tin Mill Products sold in the Eastern United States are manufactured by firms located either in the Eastern United States or eastern Canada. Among the factors that tend to limit import penetration are the longer lead times required for offshore orders, higher shipping costs, the inability of some importers to provide the full range of product specifications required by some customers, anti-dumping duties currently in force against several Japanese producers, and voluntary self-restraint by importers who are fearful of prompting additional scrutiny of and tariff protection against imports.

Thus, a small but significant increase in the price of Tin Mill Products would not cause Tin Mill Products customers in the Eastern United States to substitute purchases from outside of the Eastern United States in sufficient quantities so as to make such a price increase unprofitable. Accordingly, the Eastern United States is a relevant geographic market in which to assess the competitive effects of Mittal Steel's proposed acquisition of Arcelor on sales of Tin Mill Products.

### 3. *Anticompetitive Effects of the Acquisition*

The complaint alleges that, in this highly concentrated market for Tin Mill Products, a combination of Mittal Steel and Arcelor likely would: (i) substantially lessen competition generally in the development, manufacture and sale of Tin Mill Products in the Eastern United States; (ii) eliminate actual and potential competition between Mittal Steel and Arcelor in the development, manufacture and sale of Tin Mill Products; and (iii) increase the prices for Tin Mill Products, lessen the quality of Tin Mill Products, lessen the innovation relating to Tin Mill Products, and adversely affect the delivery terms currently offered to the customers in the Tin Mill Products market.

The market for Tin Mill products in the Eastern United States is highly concentrated and is dominated by two firms, Mittal Steel, an integrated steelmaker which accounted for 31 percent of the tons sold in 2005, and another integrated steelmaker, which accounted for more than 44 percent of the tons sold in 2005. Luxembourg-based Arcelor is a significant competitor, which accounted for about two percent of tons sold in the Eastern United States in 2005. Dofasco, which Arcelor acquired in February 2006, accounts for about four percent of the tons sold in 2005 in the Eastern United States. Were Mittal Steel to acquire Arcelor, the largest two remaining firms would account for more than 81 percent of Tin Mill Products sales in the Eastern United States. In 2005, Mittal Steel and one other firm accounted for more than 2.1 million tons of such sales.

The acquisition of Arcelor by Mittal would thus substantially increase the concentration in the Eastern United States Tin Mill Products market. Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI") (defined and explained in Appendix A), the proposed transaction will increase the HHI in the market for Tin Mill Products in the Eastern

United States by approximately 412 points to a post-acquisition level of approximately 3,522, well in excess of levels that raise significant antitrust concerns.

Mittal Steel's elimination of Arcelor as an independent competitor in the manufacture and sale of Tin Mill Products within the Eastern United States is likely to facilitate anticompetitive coordination among the two major Tin Mill Products manufacturers by making such coordination more profitable and harder to defeat. If the two largest Tin Mill Products firms in the Eastern United States were to seek to raise prices or reduce output today, purchasers of Tin Mill Products could purchase Tin Mill Products from Arcelor and its subsidiary Dofasco. Arcelor has substantial excess and divertible capacity in Europe, and Arcelor's Dofasco subsidiary has significant divertible capacity in Canada. Were Arcelor and Dofasco no longer available as independent suppliers, the remaining domestic and foreign fringe producers would likely not have sufficient capacity and/or incentives to increase sales in the Eastern United States enough to defeat an anticompetitive price increase or output reduction by the two largest firms. In particular, the only other incumbent producer located in the Eastern United States lacks the ability to manufacture cold-rolled substrate, and its ability to obtain the additional substrate needed to increase its output is uncertain.

De novo entry into the development, manufacture and sale of Tin Mill Products is difficult, time-consuming, and costly, and such entry would not be timely, likely, or sufficient to defeat coordination by the two largest Tin Mill Products firms in the Eastern United States post-merger. To produce Tin Mill Products, a firm needs a reliable source of cold-rolled substrate and a Tin Mill Products finishing facility. Entry by a firm that lacks the ability to manufacture cold-rolled substrate would be extremely difficult. A facility to finish cold-rolled substrate into Tin Mill Products would likely cost in the range of $60 to $100 million and take approximately two

years to design and build. The cost of entry is largely "sunk," *i.e.*, it cannot be recovered or converted to other uses, raising the risk to entry, and there is a very high risk that a new entrant may not receive any profits from its entry.

Significant new foreign entry or expansion of shipments to the Eastern United States by existing foreign producers is unlikely due to longer delivery lead times occasioned by oceangoing transportation, additional shipping costs, trade barriers, the possibility of future import restrictions, and the reluctance of foreign Tin Mill Products manufacturers to abandon existing markets elsewhere in order to enter the Eastern United States market. Overseas shipping increases the time between order and delivery by up to four months, which is unacceptable for many customers because their demand requirements fluctuate with hard-to-predict fruit and vegetable harvests. Capacity constraints also limit the ability of certain foreign producers from expanding their sales into the Eastern United States. Therefore, entry or expansion by any other firm into the Eastern United States Tin Mill Products market would not be timely, likely, or sufficient to deter post-acquisition coordination.

III.

## EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment will preserve competition in the market for Tin Mill Products in the Eastern United States by requiring the divestiture of one of the three North American tin mills that Mittal Steel will own following its acquisition of Arcelor: (1) the Dofasco mill, currently owned by Arcelor; (2) Mittal's Sparrows Point facility; or (3) Mittal's Weirton facility. The proposed Final Judgment provides for the divestiture of the entire steel mill and not simply the finishing lines for Tin Mill Products, and in the case of Dofasco requires divesting the entirety of Dofasco's steel business. The proposed Final Judgment sets forth a

procedure under which Mittal Steel is first required to use its best efforts to sell Dofasco to ThyssenKrupp or an alternative purchaser approved by the United States. If Mittal Steel is unable to sell Dofasco because it proves impossible to dissolve the stichting created by Arcelor to hold legal title to its Dofasco shares, then the Department of Justice can select either the Sparrows Point or Weirton facilities for divestiture.

The required divestiture of Dofasco will remedy the anticompetitive effects of the acquisition alleged in the Complaint, and in the event such a divestiture is not possible, the alternate divestiture of either Sparrows Point or Weirton (as selected by the United States) would likewise be sufficient to remedy those effects. The divestiture of the Dofasco Business or a Selected Business would preserve an independent competitor with sufficient Tin Mill Products capacity to replace Arcelor/Dofasco as an impediment to profitable and successful coordination post-merger. In either case, the preserved competitor would have modern and efficient facilities located close enough to customers in the Eastern United States to compete effectively.

The proposed Final Judgment provides that for any divestiture to be approved, it must be demonstrated to the satisfaction of the United States, in its sole discretion, that the Divested Business can and will be used by the Acquirer as a viable ongoing business that will remedy the competitive harm alleged in the Complaint. The divestiture must be made to an Acquirer that in the United States's judgment has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the development, production and sale of Tin Mill Products; the divestiture also must be accomplished in a manner that satisfies the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer and the defendant gives the defendant the ability unreasonably to raise the Acquirer's costs, reduce the Acquirer's efficiency, or otherwise interfere in the ability of the

Acquirer to compete effectively in the development, production and sale of Tin Mill Products. Mittal Steel must take all reasonable steps necessary to accomplish the divestiture quickly and shall cooperate with prospective purchasers.

The proposed Final Judgment requires Mittal Steel, within one hundred and twenty (120) days after the filing of the Complaint, or five (5) days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest the Dofasco Business to ThyssenKrupp. The United States, in its sole discretion, may agree to one or more extensions of this time period, not to exceed in total sixty (60) calendar days, and shall notify the Court in each such circumstance. At its option, defendant may elect to sell the Dofasco Business to an alternative Acquirer acceptable to the United States in the sole discretion of the United States. Mittal Steel agrees to use its best efforts to divest expeditiously the Dofasco Business.[1]

In the event Mittal Steel is unable by virtue of the stichting to accomplish the divestiture of the Dofasco Business within the period prescribed by the proposed Final Judgment, then defendant shall divest, at the option of the United States, either the Sparrows Point Business or the Weirton Business. In the event that defendant does not accomplish the divestiture of the Selected Business within 90 days or within an extension to this time period, not to exceed 60 calendar days, which may be granted by the United States in its sole discretion, the proposed

---

[1] Under the terms of the Hold Separate Stipulation and Order, Mittal Steel must maintain and preserve the Dofasco Business, the Sparrows Point Business, and the Weirton Business as ongoing, economically viable competitive businesses from the date of entry of the Hold Separate Stipulation and Order until the divestiture required by the proposed Final Judgment is accomplished. In addition, the Hold Separate Stipulation and Order requires that Mittal Steel ensure that Dofasco operates as an independent, economically viable, and ongoing competitive business concern, held separate and apart from Mittal Steel's other operations, and that it will remain independent and uninfluenced by Mittal Steel while the divestiture of Dofasco is pending or until the United States selects either the Sparrows Point Business or the Weirton Business for divestiture.

Final Judgment provides that the Court will appoint a trustee selected by the United States to effect the divestiture of the Selected Business.

In the event that a trustee is to be appointed, the proposed Final Judgment provides that the United States shall select a trustee to be approved by the Court. If a trustee is appointed, the proposed Final Judgment provides that defendant will pay all costs and expenses of the trustee. The trustee's fee arrangement will be structured so as to provide an incentive for the trustee based on the price and terms of the divestiture and the speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture. At the end of six months after appointment of the trustee, if the divestiture has not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

IV.

REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act (15 U.S.C. § 15) provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act (15 U.S.C. § 16(a)), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against defendant.

V.

## PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and defendant have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the Federal Register. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Maribeth Petrizzi
> Chief, Litigation II Section
> U.S. Department of Justice
> Antitrust Division
> 1401 H St. N.W., Suite 3000
> Washington, D.C. 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the proposed Final Judgment.

14

VI.

ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendant. The United States could have continued the litigation and sought preliminary and permanent injunctions against Mittal Steel's acquisition of Arcelor. The United States is satisfied, however, that the divestitures described in the proposed Final Judgment will avoid the transaction's anticompetitive effects in the provision of Tin Mill Products, and, thus, would achieve all or substantially all of the relief the government would have obtained through litigation, but without the time and expense of a trial.

VII.

STANDARD OF REVIEW UNDER THE APPA
FOR THE PROPOSED FINAL JUDGMENT

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty (60) day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court shall consider:

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15

15 U.S.C. § 16(e)(1)(A) & (B).[2]  As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995).

With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3]  In making its public interest

---

[2] In 2004, Congress amended the APPA to ensure that courts take into account the above-quoted list of relevant factors when making a public interest determination. *Compare* 15 U.S.C. § 16(e) (2004) *with* 15 U.S.C. § 16(e)(1) (2006) (substituting "shall" for "may" in directing relevant factors for court to consider and amending list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms). On the points discussed herein, the 2004 amendments did not alter the substance of the Tunney Act, and the pre-2004 precedents cited below remain applicable.

[3] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F.

determination, a district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case. *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003).

Court approval of a final judgment requires a standard more flexible and less strict than the standard required for a finding of liability. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F.Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not

---

Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"); *see generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60.

In its 2004 amendments to the Tunney Act, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16 (e)(2). This language codified the intent of the original 1974 statute, expressed by Senator Tunney in the legislative history: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather:

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

*United States v. Mid-America Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977).

## VIII.

## DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: August \_\_, 2006

                        Respectfully submitted,

                        */s/ Kerrie J. FC*
                        Kerrie Freeborn
                        John Greaney
                        Stephen Harris
                        Lowell Stern (DC Bar #440487)
                        Attorneys
                        U.S. Department of Justice
                        Antitrust Division, Litigation II Section
                        1401 H Street, N.W., Suite 3000
                        Washington, D.C. 20530
                        (202) 307-0924