UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
AUG 0 2 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 06-1360 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MITTAL STEEL COMPANY N.V., ) | DECK TYPE: Antitrust |
| ) | |
| ) | DATE STAMP: |
| ) | |
| Defendant. ) | |

### HOLD SEPARATE STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

I.

### DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A.   "Acquirer" means the entity or entities to whom defendant divests either the Dofasco Business or either of the Alternative Business.

B.   "Alternative Business" means the Sparrows Point Business and the Weirton Business, either collectively or individually.

C.   "Arcelor" means Arcelor, S.A., a Luxembourg corporation with its headquarters in Luxembourg City, Luxembourg, its successors and assigns, and its subsidiaries, divisions, groups,

affiliates, partnerships, joint ventures, and their directors, officers, managers, agents, and employees.

D.  "Dofasco Business" means all assets, interests, and rights in Dofasco Inc., including any additions, improvements, or expansions made by Arcelor after Arcelor's acquisition of Dofasco on or about February 20, 2006, and includes but is not limited to:

1. all tangible assets that comprise Dofasco, including research and development activities, all manufacturing equipment, tooling and fixed assets, personal property, inventory, office furniture, materials, supplies, on- or off-site warehouses or storage facilities and other tangible property, and all assets used in connection with the Dofasco business; all licenses, permits and authorizations issued by any governmental organization relating to Dofasco; all supply agreements relating to Dofasco; all contracts, teaming agreements, agreements, leases, certifications, commitments, and understandings; all customer contracts, lists, accounts, and credit records relating to Dofasco; and all other records relating to Dofasco;

2. all intangible assets used in the development, production, servicing, and sale of products by Dofasco, including but not limited to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and

2

substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information provided to the employees, customers, suppliers, agents or licensees of Dofasco; all research data concerning historic and current research and development efforts relating to products produced or sold by Dofasco, including but not limited to designs of experiments, and the results of successful and unsuccessful designs and experiments, provided, however, that Dofasco does not include Dofasco's interest in Sorevco.

E. "Mittal Steel" means defendant Mittal Steel Company, N.V., a Netherlands public limited liability company with its headquarters in Rotterdam, The Netherlands, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, joint ventures, and their directors, officers, managers, agents, and employees.

F. "Sorevco" mean Sorevco and Company, Limited, the hot dip galvanizing operation located in Montreal, Quebec, Canada, that is a joint venture between Dofasco and Mittal.

G. "Sparrows Point Facility" means the steel making, rolling, and coating facility owned by Mittal Steel and located in or near Sparrows Point, Maryland.

H. "Sparrows Point Business" means all assets, interests, and rights in the Sparrows Point Facility, and includes but is not limited to:

    1. all tangible assets used in the development, production, servicing, and sale of all products produced at the Sparrows Point Facility, including but not limited to all real property; any facilities used for research, development, and engineering support, and any real property associated with those

3

facilities; manufacturing and sales assets, including all manufacturing equipment, tooling and fixed assets, capital equipment, vehicles, supplies, personal property, inventory, office furniture, fixed assets and fixtures, materials, on- or off-site warehouses or storage facilities, and other tangible property or improvements; all licenses, permits and authorizations issued by any governmental organization relating to the Sparrows Point Business; supply agreements; all contracts, teaming agreements, agreements, leases, certifications, commitments, and understandings relating to the Sparrows Point Business; all customer contracts, lists, accounts, and credit records; and all other records maintained by Mittal Steel in connection with the operation of the Sparrows Point Business; provided, however, that with respect to any assets covered by Section I(H)(1) that relate primarily to Mittal's non-divested businesses, but also relate in part to the Sparrows Point Business, the defendant shall have the option, subject to the written approval of the United States in its sole discretion, to substitute equivalent assets or arrangements (a substituted asset or arrangement will not be deemed equivalent unless it provides the Sparrows Point Business the same benefits, or enables the Sparrows Point Business to perform the same function at the same or less cost); and further provided, that the Sparrows Point Business does not include Mittal Steel's contract to supply hot-rolled steel to the The Ford Motor Company, which contract is supplied in part by the Sparrows Point Facility;

4

2. all intangible assets currently used exclusively or primarily in the development, production, servicing, and sale of all products produced at the Sparrows Point Facility, including but not limited to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names (except to the extent such trademarks, trade names, service marks, or service names contain the trademark or name "Mittal Steel" or any variation thereof), technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information provided to the employees, customers, suppliers, agents or licensees of the Sparrows Point Business;

3. with respect to any other identified intangible assets that are not subject to Section I(H)(2) and that prior to the filing of the Complaint were used both in connection with the Sparrows Point Business and in connection with Mittal Steel's non-divested businesses, the defendant shall provide to the Acquirer a non-exclusive, non-transferable, fully-paid-up license(s) for such intangible asset(s) to the extent and for the period of time that defendant has rights to such intangible assets, provided, however, that any such license may be transferable to any future purchaser of the Sparrows Point Business;

and

4. all research data concerning historic and current research and development efforts related to the Sparrows Point Business, including but not limited to designs of experiments, and the results of successful and unsuccessful designs and experiments. To the extent that any such data also relates to historic and current research and development efforts related to businesses other than the Sparrows Point Business, providing a non-exclusive copy of such data shall fulfill defendant's obligations under this provision.

I. "ThyssenKrupp" means ThyssenKrupp AG, a German corporation with its headquarters in Dusseldorf, Germany, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, joint ventures, and their directors, officers, managers, agents, and employees.

J. "Tin Mill Products" means collectively black plate, *i.e.*, light-gauge cold-rolled bare steel sheet; electrolytic tin plate, *i.e.*, black-plate electrolytically coated with tin; and tin free steel, *i.e.*, black plate electrolytically coated with chromium.

K. "Weirton Facility" means the steel making, rolling, and coating facility owned by Mittal Steel and located in or near Weirton, West Virginia.

L. "Weirton Business" means all assets, interests, and rights in Weirton Facility, and includes but is but not limited to:

1. all tangible assets used in the development, production, servicing, and sale of all products produced at the Weirton Facility, including but not limited to

all real property; any facilities used for research, development, and engineering support, and any real property associated with those facilities; manufacturing and sales assets, including all manufacturing equipment, tooling and fixed assets, capital equipment, vehicles, supplies, personal property, inventory, office furniture, fixed assets and fixtures, materials, on- or off-site warehouses or storage facilities, and other tangible property or improvements, including but not limited to all of defendant's rights and interests in the Half Moon tin warehouse and processing facility near the Weirton Facility; all licenses, permits and authorizations issued by any governmental organization relating to the Weirton Facility; supply agreements; all contracts, teaming agreements, agreements, leases, certifications, commitments, and understandings relating to the Weirton Facility; all customer contracts, lists, accounts, and credit records; and all other records maintained by Mittal Steel in connection with the operation of the Weirton Business; provided, however, that with respect to any assets covered by Section I(L)(1) that relate primarily to Mittal's non-divested businesses, but also relate in part to the Weirton Business, the defendant shall have the option, subject to the written approval of the United States in its sole discretion, to substitute equivalent assets or arrangements (a substituted asset or arrangement will not be deemed equivalent unless it provides the Weirton Business the same benefits, or enables the Weirton Business to perform the same function at the same or less cost);

2. all intangible assets currently used exclusively or primarily in the development, production, servicing, and sale of all products produced at the Weirton Facility, including but not limited to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names (except to the extent such trademarks, trade names, service marks, or service names contain the trademark or name "Mittal Steel" or any variation thereof), technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information provided to the employees, customers, suppliers, agents or licensees of the Weirton Business;

3. with respect to any other identified intangible assets that are not subject to Section I(L)(2) and that prior to the filing of the Complaint were used both in connection with the Weirton Business and in connection with Mittal Steel's non-divested businesses, the defendant shall provide to the Acquirer a non-exclusive, non-transferable, fully paid-up license(s) for such intangible asset(s) to the extent and for the period of the time that defendant has rights to such intangible assets, provided, however, that any such license may be transferable to any future purchaser of the Weirton Business; and

8

    4.    all research data concerning historic and current research and development efforts related to the Weirton Business, including but not limited to designs of experiments, and the results of successful and unsuccessful designs and experiments. To the extent that any such data also relates to historic and current research and development efforts related to businesses other than the Weirton Business, providing a non-exclusive copy of such data shall fulfill defendant's obligations under this provision.

## II.

## OBJECTIVES

The proposed Final Judgment filed in this case is intended to ensure that the defendant promptly divests Dofasco or the Alternative Business. The purpose of the divestiture is to ensure the establishment of a viable competitor in the production and sale of Tin Mill Products in order to remedy the anticompetitive effects that the United States alleges would otherwise result from Mittal Steel's acquisition of Arcelor. This Hold Separate Stipulation and Order ensures that prior to such divestiture (a) the Alternative Business is preserved for possible divestiture and (b) the Dofasco Business is operated as a competitively independent, economically viable, and ongoing business concern that will remain independent and uninfluenced by the consummation of Mittal Steel's acquisition of Arcelor, and that competition is maintained during the pendency of the ordered divestiture.

## III.

## JURISDICTION AND VENUE

This Court has jurisdiction over the subject matter of plaintiff's Complaint alleging that the

proposed acquisition of Arcelor by Mittal Steel would violate Section 7 of the Clayton Act (15 USC §18), and the defendant does not object either to the Court's exercise of personal jurisdiction over it in this case, or to the propriety of venue of this action in the United States District Court for the District of Columbia. The defendant authorizes Cleary Gottlieb Steen & Hamilton LLP to accept service of all process in this matter on their behalf.

IV.

COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

A. The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act (15 U.S.C. § 16), and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on defendant and by filing that notice with the Court.

B. Defendant shall abide by and comply with the provisions of the proposed Final Judgment, pending entry of the Final Judgment by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C. This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

D. In the event (1) the United States has withdrawn its consent, as provided in Section

IV(A) above; or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Hold Separate Stipulation and Order, and the making of this Hold Separate Stipulation and Order shall be without prejudice to any party in this or any other proceeding.

    E.    Defendant represents that the divestiture ordered in the proposed Final Judgment can and will be made, and that defendant will later raise no claim of mistake, hardship, or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

## V.

## PRESERVATION OF ASSETS

After entry of this Hold Separate Stipulation and Order and until the divestiture required by the proposed Final Judgment has been accomplished:

    A.    Defendant shall preserve, maintain, and continue to operate the Alternative Business as an ongoing, economically viable competitive businesses.

    B.    Defendant shall use all reasonable efforts to maintain the sales and revenues of the products produced by or sold by the Alternative Business, and shall maintain at 2005 or previously approved levels for 2006, whichever are higher, all promotional, advertising, sales, technical assistance, marketing and merchandising support for the Alternative Business.

    C.    Defendant shall provide sufficient working capital and lines and sources of credit to continue to maintain the Alternative Businesses as economically viable and competitive, ongoing businesses, consistent with the requirements of Section V(A).

11

D. Defendant shall take all steps necessary to ensure that the Alternative Business is fully maintained in operable condition at no less than its current capacity and sales, and shall maintain and adhere to normal repair and maintenance schedules for the Alternative Business.

E. Defendant shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer, pledge or otherwise dispose of any of the Alternative Business.

F. Defendant's employees with exclusive or primary responsibility for the research, development, operation, and sale of the products sold by the Alternative Business shall not be transferred or reassigned to other areas within defendant's business, except for transfer bids initiated by employees pursuant to defendants' regular, established job posting policy.

G. Defendant shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestiture of the Alternative Business to an Acquirer acceptable to the United States.

VI.

HOLD SEPARATE PROVISIONS

Until the divestiture required by the proposed Final Judgment has been accomplished, or until the United States selects either the Sparrows Point Business or the Weirton Business for divestiture pursuant to Section IV(B) of the proposed Final Judgment:

A. Defendant shall preserve, maintain, and continue to operate Dofasco as a competitively independent, economically viable ongoing competitive business, with management, research, design, development, promotions, marketing, sales, and operations of such assets held entirely separate, distinct, and apart from defendant's other operations. Defendant shall not

12

coordinate its production, marketing, or terms of sale of any products with those produced by or sold by Dofasco. Within twenty (20) days after the filing of the Complaint, defendant will inform the United States of the steps the company has taken to comply with this Hold Separate Stipulation and Order.

    B.    Defendant shall take all steps necessary to ensure that (1) Dofasco will be maintained and operated as an independent, ongoing, economically viable and active competitor in the production and sale of Tin Mill Products; (2) management of Dofasco will not be influenced by defendant, except to the extent necessary to carry out defendant's obligations under this Hold Separate Stipulation and Order and the proposed Final Judgment; and (3) the books, records, competitively sensitive sales, marketing and pricing information, and decision-making concerning Dofasco will be kept separate and apart from defendant's other operations.

    C.    Defendant shall use all reasonable efforts to maintain the research, development, sales, and revenues of the products produced or sold by Dofasco, and shall maintain at 2005 levels or previously approved levels for 2006, whichever are higher, all research, development, product improvement, promotional, advertising, sales, technical assistance, marketing and merchandising support for any product developed, produced, or sold by Dofasco.

    D.    Defendant shall provide sufficient working capital and lines and sources of credit to continue to maintain Dofasco as an independent, economically viable and competitive, ongoing business, consistent with the requirements of Sections VI(A) and VI(B).

    E.    Defendant shall take all steps necessary to ensure that the assets of Dofasco are fully maintained in operable condition at no less than capacity and sales levels as of the date of the filing of the Complaint, and shall maintain and adhere to normal product improvement, upgrade, and repair

and maintenance schedules for each of those assets.

F.     Defendant shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer, pledge or otherwise dispose of any assets of Dofasco.

G.     Defendant shall maintain, in accordance with sound accounting principles, separate, accurate and complete financial ledgers, books and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues and income of Dofasco.

H.     Defendant shall take no action that would jeopardize, delay, or impede the sale of Dofasco.

I.     Defendant's employees with exclusive or primary responsibility for the research, development, production, operation, and sale of the products sold by Dofasco shall not be transferred or reassigned to other areas within defendant's business, except for transfer bids initiated by employees pursuant to defendants' regular, established job posting policy. Defendant shall provide the United States with ten (10) calendar days notice of any such transfer.

J.     Within ten (10) days of the filing of the Complaint, defendants shall appoint, subject to the approval of the United States, a person or persons to oversee Dofasco, who will also be responsible for defendant's compliance with this section. This person or persons shall have complete managerial responsibility for Dofasco, subject to the provisions of the Final Judgment. In the event that any such person is unable to perform his or her duties, defendant shall appoint, subject to the approval of the United States, a replacement within ten (10) working days. Should defendant fail to appoint a replacement acceptable to the United States within this time period, the United

14

States shall appoint a replacement at defendant's expense.

## VII.

## DURATION

A. This Hold Separate Stipulation and Order shall remain in effect until consummation of the divestiture required by the proposed Final Judgment or until further order of the Court.

15

Dated: May 11, 2006

                                                Respectfully submitted,

| FOR PLAINTIFF | FOR DEFENDANT MITTAL STEEL |
| UNITED STATES OF AMERICA | COMPANY N.V. |
| | |
| KERRIE FREEBORN | SUDHIR MAHESHWARI |
| (CA Bar # 221210) | **Managing Director** |
| | **Business Development & Treasury** |
| *[signature]* | *[signature]* |
| United States Department of Justice | Mittal Steel Company N.V. |
| Antitrust Division, Litigation II Section | 15th Floor, Hofplein 20 |
| 1401 H Street, N.W. | 3032 AC Rotterdam |
| Suite 3000 | The Netherlands |
| Washington, D.C. 20530 | |
| Telephone No.: (202) 353-3956 | |

**ORDER**

IT IS SO ORDERED by the Court, this __2__ day of __August__ 2006.

_E S Huvele_
United States District Judge