UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No.  1:06CV01360-ESH |
| | ) | |
| MITTAL STEEL COMPANY N.V., | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## RESPONSE OF PLAINTIFF UNITED STATES TO PUBLIC COMMENTS

Pursuant to the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C.

§ 16(b)-(h) ("APPA" or "Tunney Act"), the United States hereby responds to the public

comments received regarding the proposed Final Judgment in this case.  After careful

consideration of the comments, the United States continues to believe that the proposed Final

Judgment will provide an effective and appropriate remedy for the antitrust violations alleged in

the Complaint.  The United States will move the Court for entry of the proposed Final Judgment

after the public comments and this Response have been published in the *Federal Register*,

pursuant to 15 U.S.C. § 16(d).

On August 1, 2006, the United States filed the Complaint in this matter alleging that the

proposed acquisition of Arcelor S.A. ("Arcelor") by defendant Mittal Steel Company N.V.

("Mittal Steel") would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.  Simultaneously

with the filing of the Complaint, the United States filed a proposed Final Judgment and a Hold

Separate Stipulation and Order ("HSSO") signed by plaintiff and Mittal Steel consenting to the

entry of the proposed Final Judgment after compliance with the requirements of the Tunney Act, 15 U.S.C. §16.  Pursuant to those requirements, the United States filed its Competitive Impact Statement ("CIS") in this Court on August 1, 2006; published the proposed Final Judgment and CIS in the *Federal Register* on August 24, 2006, *see United States v. Mittal Steel Company N.V.,* 71 Fed. Reg. 50084, 2006 WL 2431068; and published summaries of the terms of the proposed Final Judgment and CIS, together with directions for the submission of written comments relating to the proposed Final Judgment, in *The Washington Post* for seven days beginning on September 10, 2006 and ending on September 16, 2006.  The 60-day period for public comments ended on November 15, 2006, and three comments were received as described below and attached hereto.

## I.

### THE INVESTIGATION AND PROPOSED RESOLUTION

On January 27, 2006, Mittal Steel announced its intention to commence a tender offer to acquire control of Arcelor.  At the same time, Mittal Steel announced that it would subsequently sell Arcelor's recently acquired Canadian subsidiary, Dofasco Inc. ("Dofasco") to ThyssenKrupp A.G. ("ThyssenKrupp") if it acquired control of Arcelor.  For six months following the announcement of the tender offer, the United States Department of Justice ("Department") conducted an extensive, detailed investigation into the competitive effects of the Mittal/Arcelor transaction.  As part of this investigation, the Department obtained substantial documents and information from Mittal Steel and issued eight Civil Investigative Demands to third parties.  The Department received and considered more than 45,000 pages of material.  More than fifty interviews were conducted with customers, competitors, and other individuals with knowledge of

the industry. The investigative staff carefully analyzed the information provided and thoroughly

considered all of the issues presented. The Department considered the potential competitive

effects of the transaction with respect to a number of steel products, obtaining information about

these products from customers, competitors, and other knowledgeable parties. The Department

concluded that the combination of Mittal Steel and Arcelor likely would lessen competition in

one market — Tin Mill Products ("TMP") sold to customers in the United States, east of the

Rocky Mountains ("Eastern United States.")  TMP are finely rolled steel sheets, usually coated

with a thin protective layer of tin or chrome. TMP include black plate, electrolytic tin plate

("ETP"), and tin free steel ("TFS"). Black plate is a light-gauge cold-rolled bare steel sheet that

serves as a substrate for production of ETP and TFS. Black plate is coated with tin to produce

ETP and with chrome to produce TFS. Both ETP and TFS are used primarily in manufacturing

steel cans for packaging a wide range of food products, such as soup, fruits, and vegetables, and

non-food products, such as paints, aerosols, and shaving cream. For most TMP purchasers,

particularly food can makers, there are no close substitutes for TMP. Packaging alternatives,

such as plastic containers, are not viewed as close product substitutes. A small but significant

increase in price would not likely cause sufficient TMP can customers to switch products or

otherwise curtail their TMP usage so as to render the increase unprofitable.

More than 89 percent of TMP sold in the Eastern United States is manufactured by firms

located either in the Eastern United States or eastern Canada. A small but significant increase in

price for TMP would not cause TMP customers in the United States to substitute purchases from

outside the Eastern United States in sufficient quantities to make such a price increase

unprofitable. Mittal Steel, Arcelor, and Arcelor's subsidiary Dofasco sell TMP to customers in

the Eastern United States.

As explained more fully in the Complaint and CIS, the acquisition of Arcelor and Dofasco by Mittal Steel would substantially increase concentration and lessen competition in the production and sale of TMP in the Eastern United States, giving the top two TMP producers, including Mittal Steel, a market share of more than 81 percent of sales. Therefore, the Department filed its Complaint alleging competitive harm in the TMP market in the Eastern United States and sought a remedy that would ensure that such harm is prevented.

The proposed Final Judgment in this case is designed to preserve competition in the production, manufacture, and sale of TMP in the Eastern United States. The proposed Final Judgment requires the divestiture of sufficient assets to prevent the increase in concentration that resulted from the combination of Mittal Steel's capacity and Arcelor's capacity to supply TMP to the Eastern United States market. The proposed Final Judgment requires the divestiture of a significant steel mill that manufactures TMP for sale in the Eastern United States. Specifically, it directs a sale of Dofasco to ThyssenKrupp or an alternative purchaser acceptable to the United States. At the time the proposed Final Judgment was filed with the Court, Mittal Steel already had executed a letter of intent to sell Dofasco to ThyssenKrupp when and if Mittal Steel acquired Arcelor, at a price comparable to the price Arcelor itself paid to acquire Dofasco in early 2006. Dofasco, which has a history of successful operation as an independent entity, has not been integrated into Arcelor and thus remains a viable divestiture candidate.

Mittal Steel's announced plan to sell Dofasco to ThyssenKrupp upon its acquisition of Arcelor would have mitigated the increase in post-merger concentration in the Eastern United States that would have resulted from its acquisition of Arcelor. As part of an effort by Arcelor's

Board of Directors to impede the tender offer, however, Arcelor sought to prevent any future effort by Mittal Steel to divest Dofasco by transferring Arcelor's Dofasco legal title to an independent Dutch foundation, known as the Strategic Steel Stichting ("S3"). Since Mittal completed its acquisition of Arcelor, Arcelor and Mittal Steel have requested that the S3 dissolve itself so as to permit the sale of Dofasco to ThyssenKrupp. The board of the S3 nevertheless has decided not to dissolve itself.

In negotiating the proposed Final Judgment, the parties recognized that the existence of the S3 could prevent Mittal Steel from divesting Dofasco in a timely manner. For this reason, the Department determined that alternative assets, owned by Mittal Steel and not burdened with any restrictions on sale, should be designated to accomplish the intended preservation of TMP competition in the event that Mittal Steel were unable to divest Dofasco within the time allowed by the decree. The proposed Final Judgment requires Mittal Steel to divest one of two steel mills — Sparrows Point or Weirton — if, despite its best efforts to do so, it has not been able to carry out the divestiture of Dofasco within the period allowed by the decree. Sparrows Point is a fully integrated steel mill located near Baltimore, Maryland, which produces a diversified portfolio of products, including hot-rolled sheet, cold-rolled sheet, galvanized sheet, Galvalume, and TMP, for construction, steel service center, container, appliance, and other end-use markets. Weirton, located in Weirton, West Virginia, operates primarily as a TMP finishing facility, converting steel slabs obtained from Mittal's Sparrows Point and Cleveland plants.

In the Department's judgment, divestiture of Dofasco to ThyssenKrupp or another qualified purchaser would remedy the violation alleged in the Complaint because Dofasco is an integrated steel mill that has the demonstrated capacity to make significant TMP sales in the

Eastern United States. In the event that Mittal fails to sell Dofasco in a timely manner due to legal impediments arising from its control by the S3 and the S3's refusal to permit its sale, the proposed Final Judgment provides that the Department will determine whether Sparrows Point or Weirton should be divested to remedy the violation alleged in the Complaint. The Department is confident that these options allow it to select an alternate facility the divestiture of which to a viable qualified purchaser would remedy the violation. Each mill currently makes substantial TMP sales in the Eastern United States, and the successful continued operation of either mill by a viable qualified purchaser would remedy the violation. The Department is currently assessing which of these two mills is most likely to continue as an on-going vigorous competitor for TMP sales in the event that Dofasco cannot be divested. Sparrows Point is an integrated facility that produces a variety of steel products in addition to TMP, and it manufactures its own steel slabs, which are the basic raw material for TMP fabrication. Weirton currently operates as a TMP finishing facility that converts slabs obtained from Mittal Steel's Sparrows Point and Cleveland mills. Mittal recently idled Weirton's slab-making facilities because they were considered to be less efficient than other slab manufacturing locations within the Mittal Steel organization, and the Department is assessing whether those facilities could be reactivated to produce slabs at Weirton on a cost-effective basis in the event of Weirton's divestiture. Even if the Department concludes that cost-effective slab production at Weirton is not likely to be feasible, there still may be sources from which Weirton could obtain slabs with a degree of consistency and reliability, and at a cost that would enable it to compete successfully as an independent supplier of TMP to the Eastern United States market. The Department will consider the availability of slabs to Weirton and other relevant considerations in determining whether Sparrows Point or Weirton should be

divested to remedy the violation alleged in the Complaint, and it will select the mill that is most

likely to continue to compete successfully for TMP sales in the Eastern United States following

its divestiture by Mittal Steel. The proposed Final Judgment would permit this process to go

forward if Dofasco cannot be sold in a timely manner. Although entry of the proposed Final

Judgment would terminate this action, the Court would retain jurisdiction to construe, modify, or

enforce the provisions of the proposed Final Judgment and punish violations thereof.[1]

## II.

### SUMMARY OF PUBLIC COMMENTS AND RESPONSES

During the 60-day public comment period, the United States received comments from

Silgan Containers Corporation ("Silgan"), ThyssenKrupp, and DaimlerChrysler Corporation

("DaimlerChrysler"). Upon review, the United States believes that nothing in the comments

warrants a change in the proposed Final Judgment or is sufficient to suggest that the proposed

Final Judgment is not in the public interest. The comments include concerns relating to whether

the proposed Final Judgment adequately remedies the harms alleged in the Complaint. The

United States addresses these concerns below and explains how the remedy is appropriate.

---

[1] The merger closed on August 1, 2006. In keeping with the United States's standard
practice, neither the HSSO nor the proposed Final Judgment prohibited closing the merger. *See*
ABA Section of Antitrust Law, *Antitrust Law Developments* 387 (5th ed. 2002) (noting that
"[t]he Federal Trade Commission (as well as the Department of Justice) generally will permit the
underlying transaction to close during the notice and comment period"). Such a prohibition
could interfere with many time-sensitive deals and prevent or delay the realization of substantial
efficiencies. In consent decrees requiring divestitures, it is also standard practice to include a
"preservation of assets" clause in the decree and to file a stipulation to ensure that the assets to be
divested remain competitively viable. That practice was followed here. Proposed Final
Judgment § VIII. In addition, the HSSO has been filed and entered by the Court in this case.
That Order requires Mittal Steel to preserve Weirton and Sparrows Point and to hold separate
Dofasco, pending the divestiture contemplated by the proposed Final Judgment.

### A.    *Public Comment Submitted by Silgan*

#### 1.    *Summary of Silgan's Comment*

Silgan, the largest food can producer and the largest consumer of TMP in the United States, submitted a 42-page comment with 44 attachments (attached hereto as Exhibit 1). Silgan's submission asserts that only the divestiture of Dofasco has any prospect for success, and that neither the divestiture of Weirton nor the divestiture of Sparrows Point will be effective.

Silgan's comments may be summarized in three points. First, Silgan argues that Weirton cannot long survive as an independent producer of TMP, because it cannot produce slabs — the essential TMP substrate — at a competitive cost and cannot obtain slabs from elsewhere at a competitive cost. Thus, Weirton should not be divested.

Second, Silgan further asserts that, although Sparrows Point is capable of surviving as a stand-alone producer of TMP, it currently provides 45 percent of the slabs used by Weirton. If Sparrows Point is divested, Weirton will be separated from a significant portion of its supply of slabs and will be unable to obtain a sufficient number of slabs from other sources. Thus, if Sparrows Point is divested, Weirton may cease TMP production even if it is kept in the Mittal Steel group.

Finally, Silgan concludes that since divestiture of either Weirton or Sparrows Point likely will lead to the demise of Weirton as a TMP producer, neither Mittal Steel mill should be divested. Instead, Silgan argues that Dofasco should be divested even if accomplishing that objective must await the expiration of the S3, and that the Final Judgment should be modified to extend the period for divesting Dofasco by several years. This would require that the stipulated HSSO, under which Dofasco now is operating, be modified to extend for the entire duration of

the S3.[2]

### 2.    Response of United States to Silgan's Comment

The United States has carefully considered Silgan's concern that Weirton will go out of business if the United States chooses Weirton or Sparrows Point as an alternative divestiture, but disagrees.

Silgan's conclusion rests crucially on an assumption that slabs suitable for use in TMP production would not be readily or economically available to Weirton from sources other than Sparrows Point. The United States agrees that the supply of slabs is an important issue, but the concerns raised by Silgan are overstated. If Sparrows Point is divested, and Weirton remains part of Mittal Steel, for example, there would be no concern about the availability of slabs to the divested mill. Sparrows Point is a fully integrated steel mill that does not depend on other Mittal Steel facilities for significant operational resources or supplies and indeed, in recent years has produced more slabs than it consumes. With respect to Weirton, even if the new owner of Sparrows Point refused to sell slabs on reasonable terms to Mittal Steel for use at Weirton, Mittal Steel would still own seven blast furnaces in North America, five of which are now operating, giving it ample ability to supply Weirton with slabs. Further, Mittal could obtain additional slabs for Weirton on the open market. If Weirton were divested from Mittal and sought to acquire all of its slabs from other sources, the supply of slabs would be somewhat less certain, but there is some indication that Weirton could obtain sufficient slabs, including from imports. Dofasco, as Silgan points out, obtains about 750,000 tons of slabs per year from other firms, 400,000 tons of

---

[2] Silgan asserts in its comment that the S3 has a 5-year term. Although the actual term of the S3 is not public information, it is many times longer than the period the proposed Final Judgment gives Mittal Steel to effect the divestiture of one of the three mills.

which comes from CST in Brazil. Some of those slabs are used to make tin mill products. The fact that Dofasco itself successfully imports a significant volume of tin-quality slabs suggests that an independent Weirton might have sufficient alternative sources for such slabs. The Department continues to investigate the likelihood that a divested Weirton would be able to manufacture or purchase tin-quality slabs on a cost-efficient basis. If the Department concludes for any reason that the lack of certainty regarding Weirton's viability makes divestiture of Sparrows Point preferable, the Final Judgment permits the Department to direct Mittal Steel to divest Sparrows Point.

Silgan proposes that, in lieu of divesting Weirton or Sparrows Point, the proposed Final Judgment be amended to provide that Dofasco be held separate for five years, which Silgan asserts is the duration of the S3, after which it could and should be sold.[3] This proposal presents significant problems. To ensure Dofasco's operation separately from Mittal Steel for such an extended period of time would be difficult, if not impossible. Moreover, under the HSSO, ordinary and customary business decisions that would be made promptly by an independent entity cannot be made by Dofasco without certain notices and approvals and, in some circumstances, Court permission. This situation is tolerable as a temporary solution to effectuate a prompt divestiture and to limit interference or collusion pending that divestiture. As a long-term operating arrangement, however, it could adversely affect the ability of Dofasco to operate efficiently. Given that a prompt remedy is in the public interest and that the Final Judgment provides a mechanism by which the Department can assure that adequate and viable Mittal Steel

---

[3] The Department understands that Silgan's objective would require an extension only for the duration of the S3, but Silgan is correct that this would require an extension of multiple years.

assets are divested, there is no reason to require the extraordinary and unprecedented imposition of a long-term HSSO.

### B.    *Public Comment Submitted by ThyssenKrupp*

#### 1.    *Summary of ThyssenKrupp's Comment*

ThyssenKrupp is a large German steel manufacturer that has an agreement in principle with Mittal Steel to purchase Dofasco. ThyssenKrupp currently exports TMP to customers in the United States. In its comment, attached hereto as Exhibit 2, ThyssenKrupp states that only the divestiture of Dofasco will adequately remedy the alleged anticompetitive effects set forth in the Complaint and that divestiture of Weirton or Sparrows Point cannot remedy those anticompetitive effects. ThyssenKrupp asserts that the proposed Final Judgment and CIS "make clear that divestiture of Dofasco to ThyssenKrupp is the preferred remedy for the competitive harm alleged to arise from Mittal [Steel]'s acquisition of Arcelor[.]" Ex. 2, ThyssenKrupp Comment at 3. ThyssenKrupp's comment, however, does not address the question of what should be done if Dofasco cannot be divested due to the existence of the S3. ThyssenKrupp claims that neither Weirton nor Sparrows Point has sufficiently modern and efficient facilities to compete in the TMP market in a manner that would replace competition lost as a result of the challenged acquisition. In this respect, ThyssenKrupp's comments mirror those of Silgan.

#### 2.    *Response of United States to ThyssenKrupp's Comment*

The response of the United States to the Silgan Comment is equally applicable to the comments made by ThyssenKrupp. In sum, for the reasons given in Part II.A.2 above, the United States believes that the Final Judgment provides a mechanism to ensure that assets sufficient to remedy the violation alleged in the Complaint will be divested.

Notwithstanding ThyssenKrupp's evaluation of the equipment and facilities at Weirton and Sparrows Point, the Weirton and Sparrows Point assets have proved adequate consistently to supply large quantities of TMP to the Eastern United States market. In 2005, Weirton and Sparrows Point sold more TMP in the Eastern United States than Arcelor and Dofasco combined. While capacity to manufacture TMP for sale in the Eastern United States is not the only factor, it is certainly a highly relevant factor in assessing the competitive significance of mill assets. In determining which alternate mill should be divested pursuant to the Final Judgment, the Department will focus on questions relating to the relative ability of Sparrows Point and Weirton to operate independently of Mittal Steel as future suppliers of TMP to the Eastern United States market. The fact that both mills have successfully supplied substantial quantities of TMP to the market with their current equipment supports the conclusion that the alternate mill that the United States selects to be divested would accomplish the objectives of the Final Judgment.

As to ThyssenKrupp's statement that divestiture of Dofasco is the "preferred" remedy, we agree. As discussed above, Dofasco is an attractive divestiture candidate for a number of reasons, and the proposed Final Judgment requires Mittal Steel in the first instance to use its best efforts to divest Dofasco. However, nothing in the proposed Final Judgment or the Competitive Impact Statement indicates that Dofasco is the *only* suitable divestiture candidate. Both Mittal Steel and the Department realized that Mittal Steel might be unable to accomplish the divestiture of Dofasco in a timely manner because the S3 might prevent its sale. Accordingly, the parties crafted alternative relief — the divestiture of Sparrows Point or Weirton — that also would preserve competition. Although the United States is satisfied that divestiture of Dofasco would remedy the violation alleged in the Complaint, if Dofasco cannot be sold within the period

12

prescribed by the proposed Final Judgment, the United States will decide which of the two alternatives should be divested.

### C.    *Public Comment Submitted by DaimlerChrysler*

#### 1.    *Summary of DaimlerChrysler's Comment*

DaimlerChrysler is an automobile manufacturer in North America that sources its steel from a number of North American steel producers, including Mittal Steel and Dofasco. *See* DaimlerChrsyler Comment (attached hereto as Exhibit 3). DaimlerChrysler does not use TMP in the production of automobiles and does not purchase TMP. It does, however, use another type of flat steel product called hot dipped galvanized steel, which it buys from Mittal Steel and Dofasco, and DaimlerChrysler claims that the proposed acquisition will adversely affect competition for that product. DaimlerChrysler asserts that consolidation in the steel industry since 2001 has reduced the number of North American manufacturers of hot dipped galvanized steel from nine to five, and that after the acquisition of Dofasco, Mittal Steel will have approximately 47 percent of North American capacity for this product. DaimlerChrysler also states that there are no adequate substitutes for this product, and that foreign producers are not suitable suppliers. DaimlerChrysler asserts that the alleged harm to competition would be alleviated if Mittal Steel were required to divest Dofasco, but that the divestiture of either Sparrows Point or Weirton would not remedy the harm because neither facility produces hot dipped galvanized steel suitable for automotive purposes.

Although DaimlerChrysler has no direct interest in the TMP market, the company nevertheless asserts that the divestiture of Weirton or Sparrows Point will not restore competition in TMP because neither facility is capable of operating as a stand-alone facility. DaimlerChrysler

cites past financial troubles of Weirton when it was a stand-alone company and Sparrows Point when it was operated by the former Bethlehem Steel Company. DaimlerChrysler asserts that either alternative facility is likely to close after divestiture. The result, according to DaimlerChrysler, would be less competition in the market for TMP.

2.    *Response of United States to DaimlerChrysler's Comment*

DaimlerChrysler's principal argument is that the United States' focus on TMP is misplaced, and that the United States should also have alleged harm to competition for hot dipped galvanized steel. During its investigation, the United States carefully and thoroughly reviewed the competitive implications of Mittal Steel's acquisition of Arcelor (and Dofasco) for a number of different potential relevant geographic and product markets, including hot dipped galvanized products. Upon completion of its review, the United States determined that it should allege a violation and seek relief only with regard to sales of TMP in the Eastern United States, and the Complaint filed in this case reflects that determination. The decision regarding the filing of a complaint as to any particular market lies within the prosecutorial discretion of the United States.

With respect to the market for TMP, the United States disagrees with the DaimlerChrysler comments relating to the adequacy of a divestiture of either of the alternative assets. As discussed more thoroughly above, the United States has considered the capabilities and economic viability of each of the alternative facilities and is confident that these options allow it to select an alternate facility the divestiture of which to a viable qualified purchaser would be sufficient to restore competition to the market for the sale of TMP in the Eastern United States.

14

## III.

## CONCLUSION

The issues raised in the public comments were among the many considered during the

United States' extensive and thorough investigation. The United States has determined that the

proposed Final Judgment as drafted provides an effective and appropriate remedy for the antitrust

violations alleged in the Complaint, and is therefore in the public interest. The United States will

move this Court to enter the proposed Final Judgment after the comments and response are

published.

Dated: 2/13/07

Respectfully submitted,

LOWELL R. STERN (D.C. Bar #440487)
Attorney

United States Department of Justice
Antitrust Division
Litigation II Section
1401 H Street, N.W., Suite 3000
Washington, DC 20530
Telephone: (202) 307-0924
Facsimile:  (202) 307-6283

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of February, 2007, I caused a copy of the

foregoing Plaintiff United States's Response to Public Comments to be mailed, by U.S. mail,

postage prepaid, to the attorneys listed below and I caused the attachments thereto to be delivered

by electronic transmission to the attorneys listed below:

_____
Lowell R. Stern


For Mittal Steel Company N.V.:

Mark Leddy, Esquire
Brian Byrne, Esquire
Jeremy J. Calsyn, Esquire
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, D.C.  20006

For Arcelor S.A.:

John M. Nannes, Esquire
Michael V. Sosso, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, D.C.  20005

For Silgan Containers Corporation:

Daniel L. Porter, Esquire
Vinson & Elkins LLP
1455 Pennsylvania Avenue NW, Suite 600
Washington, D.C.  20004-10009

For ThyssenKrupp A.G.:

Steven K. Bernstein, Esquire
James F. Lerner, Esquire

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

A. Paul Victor, Esquire
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY 10019-6092


For DaimlerChrysler Corporation:

Thomas B. Leary, Esquire
Janet L. McDavid, Esquire
Hogan & Hartson LLP
Columbia Square
555 Thirteenth Square, NW
Washington, DC 20004