# EXHIBIT 3

# HOGAN & HARTSON

Hogan & Hartson LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
+1.202.637.5600 **Tel**
+1.202.637.5910 **Fax**

**www.hhlaw.com**

November 15, 2006

Maribeth Petrizzi, Esquire
Chief, Litigation II Section
Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 3000
Washington, D.C. 20530

**Re:    DaimlerChrysler Tunney Act Comments**

Dear Maribeth:

DaimlerChrysler submits that the United States Department of Justice Antitrust Division (the "Division" or "Antitrust Division") should renegotiate its proposed consent decree with Arcelor Mittal to ensure that Dofasco is either divested as planned or operated separately until it can be sold. The alternative divestitures in the proposed consent decree do not adequately address the competitive problems created by the Arcelor-Mittal merger.

## INTRODUCTION

The Tunney Act requires that a proposed consent decree negotiated between the Antitrust Division and the parties be published in the *Federal Register*, with a 60 day period for public comment. 15 U.S.C. § 16. The Act also requires a federal court to determine if the entry of final judgment on the terms agreed to in the proposed consent decree, is in the public interest. *Id.*

DaimlerChrysler is aware of the Division's position that Tunney Act review requires only an examination of whether the relief proposed satisfactorily remedies the competition issues pleaded in the Complaint. In this case, the Complaint identified competitive issues in the market for Eastern United States Tin Mill Products. However, this settlement is worthy of reconsideration by the Division for several reasons.

- First, although both the Division and Mittal apparently believed that Dofasco could be divested, that turns out not to be true. The directors of Strategic Steel Stichting, the Dutch foundation holding Dofasco's shares ("Dutch trust"), have refused to dissolve the Dutch trust and relinquish the shares.

\\\DC - 082366/000003 - 2391297 v1

Maribeth Petrizzi, Esquire
November 15, 2006
Page 2

- Second, recent events demonstrate that the automotive issues resulting from the merger are far more important for the automobile industry than they first appeared.

- Third, the alternative divestitures are not likely to preserve competition in either the market alleged in the Complaint, Eastern United States Tin Mill Products, or the North American Hot Dipped Galvanized Steel market.

DaimlerChrysler submits these comments in support of the Division's preferred remedy – the divestiture of Dofasco – and to explain the infirmities in the alternative divestiture candidates.

## THE ARCELOR-MITTAL MERGER

### A.   Merger Chronology

In January 2006, Mittal Steel Company N.V. ("Mittal") announced its intention to launch a hostile tender offer to acquire Arcelor S.A. ("Arcelor"). In an attempt to preempt potential antitrust objections to the proposed combination in the United States, Mittal simultaneously announced that if it acquired Arcelor, it intended to sell Arcelor's subsidiary, Dofasco Inc. ("Dofasco"), which Arcelor was in the process of acquiring at that time, to ThyssenKrupp, a German-based steel corporation. Arcelor initially resisted Mittal's takeover attempt vigorously and, as part of that resistance, transferred its interest in Dofasco to the Dutch trust as a defensive measure against Mittal's tender offer. After the Dofasco transfer, Arcelor's Board agreed to recommend Mittal's improved $33 billion offer to its shareholders on June 25, 2006, and the combination of Arcelor and Mittal is now under way. *See* Paul Glader, *Mittal's Founder Asserts Control as Steelmaker*, Wall St. J., (Nov. 7, 2006). On November 13, 2006, Arcelor Mittal announced that the directors of the Dutch trust had decided not to dissolve the Dutch trust and this action has blocked Arcelor Mittal's divestiture of Dofasco – the Division's preferred remedy. *See* Press Release, Arcelor Mittal, Arcelor Mittal Press Release on Dofasco (Nov. 13, 2006) *available at:* http://www.arcelormittal.com/index.php?lang=en&page=49&tbPress=here&tb0=10.

### B.   Complaint and Proposed Consent Decree

In May 2006, the Division negotiated a "pocket consent decree" with Mittal in which Mittal agreed to divest Dofasco. At that time, it appears that neither the Division nor Mittal fully appreciated the obstacles to the Dofasco divestiture created by the Dutch trust. On August 1, 2006, the Antitrust Division filed a Complaint, proposed consent decree, and Competitive Impact Statement with the United States District Court for the District of Columbia, conditionally approving Mittal's proposed acquisition of Arcelor.

Maribeth Petrizzi, Esquire
November 15, 2006
Page 3

### 1.    *Alleged Anticompetitive Effects on Tin Mill Products*

In the Complaint and Competitive Impact Statement, the Division alleged that Mittal's acquisition of Arcelor would substantially lessen competition in the market for Tin Mill Products in the Eastern United States in violation of Section 7 of the Clayton Act. The Division alleged that the relevant geographic market for Tin Mill Products is the Eastern United States because of a number of factors, including shipping costs and anti-dumping duties on Tin Mill Products from Japan that effectively close the United States market to competition from Japan. Applying this geographic market definition to Tin Mill Products, the Division determined that the market for Tin Mill Products in the Eastern United States is highly concentrated and is dominated by Mittal and "another integrated steelmaker" (United States Steel). According to the Complaint, Mittal accounted for 31 percent of the Tin Mill product tonnage sold in this geographic market in 2005, and United States Steel accounted for more than 44 percent. The Complaint alleges that Mittal's acquisition of a combined Arcelor/Dofasco would significantly increase concentration in the already concentrated market for Eastern United States Tin Mill Products. The Complaint also alleges that the remaining competitors lack the ability and incentive to defeat anticompetitive price increases and that *de novo* or foreign entry is neither feasible nor likely.

### 2.    *The Proposed Remedies*

The proposed Final Judgment ("the proposed consent decree") aims to preserve competition in the Eastern United States Tin Mill Products market by requiring Arcelor Mittal to use its best efforts to sell its Dofasco mill in Canada to ThyssenKrupp or another approved buyer. In the event that Mittal is unable to dissolve the Dutch trust – which now appears to be the case – Mittal may sell either Mittal's Sparrows Point or Weirton facilities (collectively "alternative divestitures"). While the proposed consent decree clearly reveals the Division's preference that Mittal divest Dofasco, it states that divestiture of either Weirton or Sparrows Point is sufficient to preserve competition. DaimlerChrysler agrees that the divestiture of Dofasco solves the competitive problems created by the Arcelor-Mittal merger, but disagrees with the Division's view that either of the alternative divestitures would be sufficient to preserve competition.

### C.    **DaimlerChrysler's Interest – Hot Dipped Galvanized Steel**

DaimlerChrysler is an automobile manufacturer that sources its steel from a number of North American steel producers including Mittal and Dofasco. DaimlerChrysler does not, however, utilize Tin Mill Products in its production of automobiles, nor do the other North American automobile manufacturers. If Tin Mill Products were the only problematic product market, DaimlerChrysler and the rest of the automobile industry would have little interest in Mittal's and the Division's choice of remedies. However, DaimlerChrysler and other automobile manufacturers are keenly interested in which facility is divested because the market for Hot Dipped Galvanized Steel would be even more adversely affected by Mittal's acquisition of Arcelor. DaimlerChrysler utilizes up to a ton of Hot Dipped Galvanized Steel per vehicle produced.

Maribeth Petrizzi, Esquire
November 15, 2006
Page 4

DaimlerChrysler fully supports the Division's preferred divestiture of Dofasco, but submits that the alternative divestitures would not preserve necessary competition. The divestiture of Dofasco would ensure that Dofasco remains an independent competitive restraint on the increasingly consolidated Hot Dipped Galvanized Steel market. Further, this divestiture would allow for continued regional competition in Canada.

### D.    Alternative Divestiture Remedies Should Be Rejected

Divestiture of either Sparrows Point or Weirton likely will not preserve competition for Eastern United States Tin Mill Products and certainly will not prevent the merger's anticompetitive effects in the Hot Dipped Galvanized Steel market. Neither Sparrows Point nor Weirton is attractive to potential buyers, nor do they have the ability to compete in either market as an independent company. Instead, each is a candidate for closure, especially during economic downturns. Weirton's steel making capability has already been shut down, making Weirton only a rolling mill and coating facility that is dependant upon a source of hot bands, which presently are in short supply. Sparrows Point still has the ability to make steel, but it has never demonstrated that it is viable as a stand-alone facility; it has always been part of a larger, multi-facility corporation. Dofasco, unlike either of the alternative divestiture candidates, was a profitable stand-alone company as late as January 2006.

## NORTH AMERICAN HOT DIPPED GALVANIZED STEEL

DaimlerChrysler recognizes that the Division's Complaint and proposed consent decree focus on the anticompetitive impact of the merger on the Eastern United States Tin Mill Products market and not the North American Hot Dipped Galvanized Steel market. However, this view should be reconsidered.

### A.    Product Market

The automotive industry requires various steel alloys for frame, shell, and various parts that make up a complete automobile. Because of their exposure to the elements, automobiles require steel that resists corrosion. But, automobile manufacturers cannot utilize all grades of corrosion resistant steel. Automobile-grade exposed corrosion resistant steel must also be of high strength and high enough quality to apply paint. While corrosion resistant steel of lower grades can be used in construction or products like home appliances, only sufficiently high quality, automotive-grade corrosion resistant steel can be used by the automobile industry. The most cost-efficient material to provide this protection is steel that is coated with a rust-inhibiting layer, usually composed primarily of zinc, which is referred to as Galvanized Steel. DaimlerChrysler utilizes up to a ton of Galvanized Steel per vehicle.

Two methods of galvanization are used to provide protection from corrosion – Electroplate Galvanizing and Hot Dipped Galvanizing. In Electroplate Galvanizing, steel is passed through a zinc-rich bath at ambient air temperature. An electric current is passed through the steel, which attracts particles of zinc to the steel's surface thereby plating it. In Hot Dipped

Maribeth Petrizzi, Esquire
November 15, 2006
Page 5

Galvanizing, heated steel sheet is passed through a bath of molten zinc resulting in a thin coating of an essentially pure zinc layer on the steel. The post-coating application of heat to the zinc coated steel promotes a reaction between the iron in the steel and the zinc in the coating, creating the zinc-iron compound known as "Galvanneal." In contrast, the iron and zinc do not react in electroplate galvanization and thus do not produce the desirable properties characteristic of Galvanneal.

       1.    *Hot Dipped vs. Electrogalvanizing*

Automotive-grade Hot Dipped Galvanized Steel constitutes a separate product market from galvanized steel generally because Electroplate Galvanized Steel has more limited uses and applications, especially in the automotive industry. Hot Dipped Galvanizing is less costly than Electrogalvanizing and requires substantially less energy to produce. Hot Dipped Galvanizing also imparts desirable high strength to the steel without the addition of costly alloying elements. Even if Electrogalvanizing proved to be adequate for automotive needs, the differences in stamping properties for automotive uses would require major investments in stamping, painting and other processes by automobile manufacturers that sought to switch from one process to another. As a result, Hot Dipped Galvanized Steel and Electroplate Galvanized Steel cannot easily be substituted by automobile manufacturers.

Automotive uses also require much higher grade of steels, which Hot Dipped Galvanization can best supply. For example, automotive uses require a smooth finish and very precise alloy chemistries. Hot Dipped Galvanneal has better cosmetic corrosion performance than Electrogalvanized Steel which typically has more surface defects. Automotive use also requires very tight width and thickness tolerances that Hot Dipped Galvanization can better provide. As a result, production yields for automotive-grade Galvanized Steel are much lower than for other end uses.

       2.    *Substitutes for Galvanized Steel*

As explained above, steel can be galvanized two ways – by the hot dipped or electroplating processes. Automotive companies have explored other materials, but none is likely to replace galvanized/galvannealed steel in the foreseeable future. Like electrogalvanized steel, available alternatives are not adequate for automotive uses. Non-coated steel is much less corrosion-resistant and fails to meet minimum automotive standards for quality. Painted steels similarly fail to meet such standards. Stainless steel, while able to meet quality standards, is far too costly to serve as a viable alternative to Hot Dipped Galvanized Steel. As a result, Hot Dipped Galvanized Steel is a separate relevant product market.

**B.    The Relevant Geographic Market**

For DaimlerChrysler and other North American automobile manufacturers, the only practical Hot Dipped Galvanized Steel suppliers are in North America.

Maribeth Petrizzi, Esquire
November 15, 2006
Page 6

### 1.    *Logistical Limitations*

Reliance on overseas imported steel is not economically feasible because of the logistical obstacles presented by the product itself. As Susan DeSandre, Director of Body and Chassis Purchasing, North America for Ford Motor Company characterized it in proceedings before the United States International Trade Commission, "it's heavy, it's bulky, and it rusts on water."[1] Automobile producers require continuous supply to keep the production lines running and it is not economically feasible to transport steel by air to accommodate unforeseen variations in demand.

### 2.    *Tariffs on Imported Steel*

Currently, Australia, Canada, France, Germany, Japan, and Korea are subject to antidumping and/or countervailing duties on corrosion resistant flat steel products, including Hot Dipped Galvanized Steel. On October 17, 2006, the International Trade Commission heard testimony on whether it should renew tariffs on the foreign supply of Corrosion Resistant Steel, which are currently being reviewed. The six largest automobile producers in North America have advocated removal of the duties on Corrosion Resistant Steel because the domestic steel industry is healthy and would not be materially injured by their removal. In addition, automobile producers have argued that non-U.S. sources of corrosion-resistant steel are not readily available anyway because these products are in heavy demand in foreign markets.

Although Dofasco is not a U.S. producer, an independent Dofasco would indirectly constrain anticompetitive price increases in the United States. It would be an alternate supply to DaimlerChrysler's Canadian operations and thus reduce the company's dependence on the few remaining United States suppliers of Hot Dipped Galvanized Steel. If antidumping duties are lifted on Canadian Corrosion Resistant Steel, as DaimlerChrysler believes is appropriate, a divested Dofasco has the capacity to compete directly with the three remaining North American Hot Dipped Galvanized Steel producers, US Steel, Arcelor Mittal, and AK Steel.[2] If Dofasco were controlled by Mittal, there would be no incentive for it to do so.

---

[1] *Certain Carbon Steel Products from Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Poland, Romania, Spain, Sweden, Taiwan and the United Kingdom*, USITC Inv. Nos. 701-TA-319, 320, 325-328, 348 and 350 (Second Review) and 731-TA-573, 574, 576, 578, 582-587, 612, and 614-618 (Second Review) Hearing Transcript at 426 (testimony of Ms. DeSandre) (Oct. 17, 2006).

[2] A fourth supplier, Nucor Corp., is not a practical alternative supplier to the auto industry for exposed automotive-grade corrosive resistant steel because its production method, which utilizes recycled scrap metal, produces steel that does not meet the tolerances required by automobile makers for substrate.

Maribeth Petrizzi, Esquire
November 15, 2006
Page 7

### C.   Market Concentration

Today, the market for North American Hot Dipped Galvanized Steel is highly concentrated with the top two firms representing approximately 73% of capacity and the top three firms representing nearly 90%. Arcelor Mittal alone represents nearly half of North American capacity for Hot Dipped Galvanized Steel with its acquisition of Arcelor (including Dofasco's Canadian facilities). Unless Dofasco is divested, the post-merger Herfindahl-Hirschman Index for the North American Hot Dipped Galvanized Steel market will rise from a premerger total of 2171 to more than 3200 – well above the Guidelines' threshold of 1800 for a highly concentrated market. The change in concentration resulting from the merger would be over 1000 points – again well above the Guidelines' threshold for concern.

#### 1.   *Concentration through Consolidation*

Only five years ago, DaimlerChrysler had a choice of nine suppliers to choose from to meet its demand for Hot Dipped Galvanized Steel. In 2001, Mittal represented a mere 8% of North American Hot Dipped Galvanized Steel capacity. LTV's bankruptcy in 2001 and subsequent combination with Bethlehem Steel into International Steel Group in 2002 ushered in a wave of consolidation that continues today. In 2003, US Steel acquired National Steel, leaving only seven suppliers of North American Hot Dipped Galvanized Steel. Mittal increased its share from 8% to 30% with its acquisition of ISG in 2005. Mittal achieved market leadership with its acquisition of Arcelor and its Dofasco facilities in Canada, and DaimlerChrysler estimates that Arcelor Mittal now has 47% of North American Hot Dipped Galvanized Steel capacity.



2006 North America Hot Dip Auto Capacity

Maribeth Petrizzi, Esquire
November 15, 2006
Page 8

### 2.    *Effect of Consolidation on Prices*

Although it is too early to detect the effect that Mittal's acquisition of Arcelor and Dofasco will have on prices, rising prices over the last five years, coupled with comments to industry analysts and the press by Mittal, indicate that higher prices are to come. Indeed, Mr. Lakshmi Mittal has noted that "[c]onsolidation of the industry has accelerated ... [l]eading to a new market oriented behavior...[a]nd a new fundamental price dynamic." *See* "New Steel Paradigm and Future Challenges," Presentation by Lakshmi Mittal to Merrill Lynch Conference (May 11, 2006).

Over the past six years, the average price for Galvanized Steel has risen from about $500 per ton in 2000 to nearly $900 per ton earlier this year. DaimlerChrysler expects significant price increases for contracts starting in 2007. Over this same period, the number of industry participants dwindled. Thus, industrial production has decreased while prices increased to a new, higher band.

Comments to industry analysts and press by Mittal leave little doubt that the goal and likely result of consolidation is the continued rise in prices to consumers. The *Automotive News* observed in October of this year that "Mittal has taken steps to stave off price cuts caused by a recent run-up in steel inventories." It added, "Mittal is prepared. The company has told analysts that it will prop up prices by reducing production at one plant during that period." *A Ton of Trouble*, Automotive News (Oct. 2, 2006). "Mr. Mittal also hopes that a new, larger group may be able to set a lead for the rest of the industry – sending signals about when to moderate production, and so smooth the peaks and troughs in demand that have bedeviled the steel business." *Steel: Age of Giants*, The Economist (Feb. 2, 2006) (emphasis added).

As a result, there is reason for concern about the effect of the merger on output and prices for North American Hot Dipped Galvanized Steel. These effects would be reduced by divestiture of Dofasco – and the Division should insist on its original preferred remedy.

## NEITHER ALTERNATIVE DIVESTITURE IS VIABLE

Although the unique circumstances existing here warrant reconsideration of this transaction's effects on the North American Hot Dipped Galvanized Steel market, the alternative divestiture remedies also fail to remedy the Division's legitimate concerns regarding the transaction's effect on the Eastern United States Tin Mill Products market.

### A.    Alternative Divestitures Will Fail to Preserve Competition in Either Tin Mill or Hot-Dipped Galvanized Steel Markets

Weirton has struggled since the 1970s and has nearly closed several times. In 1982, National Steel announced that it would not make the capital improvements needed for Weirton to remain competitive. In efforts to save the company, Weirton was purchased by its employees in 1984. Public offerings in 1989 and 1994 raised funds needed to modernize the

Maribeth Petrizzi, Esquire
November 15, 2006
Page 9

plant. However the steel import crisis that began in 1998 "significantly reduced the company's production output, harmed its ability to control pricing and severely hampered its financial performance." *See* Weirton Steel Corporation: History, *available at:* http://www.weirton.com/company/about/hist.html. Weirton lost nearly $800 million from 1998 until it declared Chapter 11 bankruptcy in 2003. ISG purchased Weirton in 2004, and ISG was acquired by Mittal in 2005. In November 2005, Mittal shut down Weirton's steelmaking operations altogether and laid off 800 employees.

Today Weirton produces no steel and instead relies on other Mittal facilities to supply the substrate it uses in its production of tin plate. It is unlikely that Weirton will produce steel going forward. *See* Vicki Smith, *Furnace Will Stay Idle at Weirton Steel Mill*, Courier-Journal (Louisville, Ky.) (Dec. 2, 2005). In any event, Weirton will almost certainly never play a role in disciplining price increases in North American Hot Dipped Galvanized Steel because it cannot produce that product. Its inability efficiently to produce the steel substrate it needs for tin mill production, coupled with relatively high transportation and raw materials costs, do not bode well for its tin mill production prospects either. In fact, Weirton is likely to be a victim of the increased concentration in the North American Steel market rather than a disciplining force. Since Weirton does not produce Hot Dipped Galvanized Steel at all, it is totally unable to discipline any output restrictions in that market.

Sparrows Point has also struggled. In October 2001, Bethlehem, which employed about 3,400 workers at Sparrows Point, filed for Chapter 11 bankruptcy. By May 2006, the plant employed only 2,500 employees and had changed hands three times in the past six years. Despite cutting costs and the introduction of new "efficiencies and innovations, Sparrows Point is one of Mittal's most expensive plants to run because of high energy costs and more environmental regulations owing to its location on the Chesapeake Bay." Allison Connolly, *Feeling Pressure for Profits*, Balt. Sun, 1C (May 14, 2006). "[W]orkers worry that Mittal will take away their incentives or force them to make other concessions to keep the plant open." *Id.* "They also worry about layoffs if certain parts of the plant are idled, for example, if Mittal sends the tin work back to Weirton." *Id.* Today, Sparrows Point is used primarily to supply other Mittal plants with substrate. It is unlikely to produce Hot Dipped Galvanized Steel for use by the automobile industry and is unlikely ever to be able to operate as a stand-alone entity.

    **B.**    **Divestiture of Dofasco Is the Only Viable Option to Preserve Competition**

Unlike either Sparrows Point or Weirton, Dofasco has recently been a successful stand alone steel company and continues to thrive independently today (pursuant to the Hold Separate Order). If not for the Dutch trust issue, Dofasco could clearly be sold to ThyssenKrupp or a number of other potential suitors. Indeed, analysts agree that Dofasco is by far the most attractive of the three mills and that Mittal has little incentive to divest it. "Right now time is on their side, and they are generating a lot of cash flow .... At the end of the day, if they can keep [Dofasco], really the winners will be Arcelor Mittal, and the losers will be ThyssenKrupp," says

Maribeth Petrizzi, Esquire
November 15, 2006
Page 10

Alain William, an analyst for Societe Generale. Heather Thomas, *Poison Pill Is Among the Reasons Mittal Steel Deal Remains a Multi-Company Tangle*, N.Y. Times (Nov. 3, 2006).

Sparrows Point and Weirton, on the other hand, will be difficult to divest, and incapable of operating as stand-alone businesses. "The problem is, who would want to buy either of the two? Mittal will have to decide which one to sell, but you can't manufacture a customer," said Charles Bradford, an independent steel analyst for Soleil Securities in New York. *See Merger Proviso Gives Hope to Weirton Steel*, Pittsburgh Tribune Rev. (Aug. 3, 2006). "Weirton and Sparrow's Point are not good plants. Dofasco is .... Dofasco's a good company and I'm not so sure that Mittal wouldn't rather have it than Weirton or Sparrow's Point." Romino Maurino, *Mittal Steel Sets Deadline for Sale of Dofasco, Inc.*, Winnipeg Free Press, (Sept. 28, 2006).

The Division, with its investigative resources, has better access than DaimlerChrysler does to the underlying facts that support these comments. It has prudently reserved the right to determine whether a divestiture of either Sparrows Point or Weirton would be feasible. The Division should revisit its view that divestiture of either Weirton or Sparrows Point would be sufficient.

## CONCLUSION

An independent Dofasco can discipline anticompetitive price increases for Tin Mill Products. But even more important from DaimlerChrysler's point of view, it can also act as a competitive constraint on anticompetitive output restrictions on the supply of North American Hot Dipped Galvanized Steel. Thus, DaimlerChrysler urges the Division to reconsider its acceptance of one of the alternative divestiture candidates and instead to insist on the divestiture of Dofasco. If the Dutch trust proves to be an immovable obstacle to the sale of Dofasco, it could simply be spun off as a freestanding entity, to operate independently, as it did as recently as January 2006. If an adequate remedy requires renegotiation of the consent decree, we urge the Division to take the steps that are necessary to maintain competition in the steel industry.

Sincerely,

Thomas B. Leary / DJ

Thomas B. Leary

Janet L. McDavid

cc: Allan M. Huss
      Senior Counsel, Antitrust/Regulatory Affairs
      DaimlerChrysler Corporation