# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  1:06CV01360-ESH |
| | ) | |
| MITTAL STEEL COMPANY N.V., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MOTION AND MEMORANDUM OF PLAINTIFF UNITED STATES
## IN SUPPORT OF ENTRY OF FINAL JUDGMENT

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C.

§ 16(b)-(h) ("APPA" or "Tunney Act"), the United States moves for entry of the proposed Final

Judgment filed in this civil antitrust case (a copy of the proposed Final Judgment is attached

hereto).  Defendant Mittal Steel Company, N.V. ("Mittal") has stipulated to the entry of the

proposed Final Judgment upon compliance with the APPA and does not object to entry of this

proposed Final Judgment without a hearing.  The Competitive Impact Statement ("CIS") (filed

August 1, 2006) and Response of the United States to Public Comments ("Response to Public

Comments") (filed February 13, 2007) explain why entry of the proposed Final Judgment is in

the public interest.  The United States is filing with this motion a Certificate of Compliance

setting forth the steps taken by the parties to comply with all applicable provisions of the APPA

and certifying that the statutory waiting periods have expired.  Thus, the proposed Final

Judgment may be entered at this time without further hearing if the Court determines that entry is

in the public interest. Entry of the proposed Final Judgment would terminate these actions,

except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of

the proposed Final Judgment and to punish violations thereof.[1]

## MEMORANDUM

### I.    Background

#### A.    Pre-Complaint Investigation

On January 27, 2006, Mittal announced its intention to commence a tender offer to

acquire control of Arcelor S.A. ("Arcelor") and to sell Arcelor's Canadian subsidiary, Dofasco

Inc. ("Dofasco") to ThyssenKrupp A.G. ("ThyssenKrupp"), if Mittal acquired control of Arcelor.

For six months following the announcement of the tender offer, the United States Department of

Justice ("Department") conducted an extensive investigation into the competitive effects of the

Mittal/Arcelor transaction. As part of this investigation, the Department obtained substantial

documents and information from Mittal and issued eight Civil Investigative Demands to third

parties. The Department received and considered more than 45,000 pages of material. More

than fifty interviews were conducted with customers, competitors, and other individuals with

knowledge of the industry. The investigative staff carefully analyzed the information provided

---

[1] The merger closed on August 1, 2006. In keeping with the United States' standard practice, neither the proposed Final Judgment nor the Hold Separate Stipulation and Order ("HSSO") prohibited closing the merger. *See* ABA Section of Antitrust Law, *Antitrust Law Developments* 387 (5th ed. 2002) (noting that "[t]he Federal Trade Commission (as well as the Department of Justice) generally will permit the underlying transaction to close during the notice and comment period"). Such a prohibition could interfere with many time-sensitive deals and prevent or delay the realization of substantial efficiencies. In consent decrees requiring divestitures, it is also standard practice to include a "preservation of assets" clause in the decree and to file a stipulation to ensure that the assets to be divested remain competitively viable. That practice was followed here. Proposed Final Judgment ¶ VIII. In addition, the HSSO has been filed and entered by the Court in this case.

2

and thoroughly considered all of the issues presented. The Department considered the potential competitive effects of the transaction with respect to a number of steel products and concluded that the combination of Mittal and Arcelor, including Dofasco's capacity, would likely lessen competition in one market: tin mill products ("TMP") sold to customers in the United States, east of the Rocky Mountains ("Eastern United States").

TMP are finely rolled steel sheets, usually coated with a thin protective layer of tin or chrome. TMP include black plate, electrolytic tin plate ("ETP"), and tin free steel ("TFS"). Black plate is a light-gauge cold rolled bare steel sheet that serves as a substrate for production of ETP and TFS. Black plate is coated with tin to produce ETP and with chrome to produce TFS. Both ETP and TFS are used primarily in manufacturing steel cans for packaging a wide range of food products, such as soup, fruits, and vegetables, and non-food products, such as paints, aerosols, and shaving cream. For most TMP purchasers, particularly food can makers, there are no close substitutes for TMP. Packaging alternatives, such as plastic containers, are not viewed as close product substitutes. A small but significant increase in the price of TMP is not likely to cause TMP customers to reduce their consumption of TMP by quantities sufficient to render the price increase unprofitable.

More than 89 percent of TMP sold in the Eastern United States is manufactured by firms located either in the Eastern United States or eastern Canada. A small but significant increase in TMP prices is not likely to cause TMP customers to substitute purchases from outside the Eastern United States or eastern Canada in quantities sufficient to render the price increase unprofitable. Mittal, Arcelor, and Arcelor's Canadian subsidiary Dofasco sell TMP to customers in the Eastern United States. The Department found that the acquisition of Arcelor and Dofasco

by Mittal would mean that the top two TMP producers (Mittal and another large steel firm) control more than 80% of the relevant sales. The Department determined that this increase in concentration likely would lessen competition in the production and sale of TMP in the Eastern United States. Accordingly, on August 1, 2006, the Department filed a Complaint in this Court alleging competitive harm in the TMP market in the Eastern United States.

**B.    The Proposed Final Judgment and Post-Complaint Investigation**

Along with the Complaint, the Department filed the proposed Final Judgment, CIS and HSSO.[2] The proposed Final Judgment seeks to preserve competition in the production, manufacture, and sale of TMP in the Eastern United States by requiring Mittal to divest one of its three North American TMP mills. In North America, Mittal currently manufactures TMP for sale in the Eastern United States from the Dofasco facility (located in Hamilton, Ontario, Canada); the Sparrows Point facility (located near Baltimore, Maryland); and the Weirton facility (located in Weirton, West Virginia).

The proposed Final Judgment required Mittal to sell (or attempt to sell) Dofasco to Thyssen-Krupp, pursuant to Mittal's pre-existing letter of intent with Thyssen-Krupp. Dofasco had a history of successful operation as an independent entity and had not been integrated into Arcelor. The Department believed that Mittal's plan to sell Dofasco to ThyssenKrupp would have mitigated the increase in post-merger concentration in the Eastern United States that would have resulted from Mittal's acquisition of Arcelor.

However, the proposed Final Judgment also identified alternative assets to be divested

---

[2] In the HSSO, Mittal agreed to comply with both the terms of the HSSO and the proposed Final Judgment pending entry of the proposed Final Judgment by the Court.

(the Sparrows Point or Weirton facilities) in the event Mittal was unable to divest Dofasco in a timely fashion. Before ultimately approving the acquisition of Arcelor by Mittal, Arcelor's Board of Directors sought to block Mittal's sale of Dofasco by transferring Dofasco's legal title to an independent Dutch foundation called the Strategic Steel Stichting ("S3"). In November 2006, S3 declined to permit the sale of Dofasco to ThyssenKrupp and, in January 2007, a European court rejected ThyssenKrupp's bid to compel the sale of Dofasco. The Department determined that Mittal was unable to sell Dofasco in the time permitted by the proposed Final Judgment. Accordingly, on February 16, 2007, the Department designated Sparrows Point as the alternative asset to be divested by Mittal. *See* Proposed Final Judgment ¶ IV(B).

The Department is confident that the divestiture of Sparrows Point to a viable qualified purchaser will remedy the violation alleged in the Complaint. Sparrows Point is a profitable, fully integrated steel mill located near Baltimore, Maryland, which produces a diversified portfolio of products, including hot rolled sheet, cold rolled sheet, galvanized sheet, Galvalume, and TMP, for construction, steel service center, container, appliance, and other end-use markets. As an integrated facility, it manufactures its own steel slabs, which are the basic raw material for TMP fabrication. Sparrows Point sells a substantial volume of TMP products in the Eastern United States, the relevant market alleged in the Complaint. Indeed, Sparrows Point sells more TMP in the affected market than does Dofasco and Arcelor. The creation of a new independent competitor in the market is likely to remedy the loss of competition threatened by Mittal's acquisition of Arcelor. As of this filing, Mittal is making substantial efforts to divest Sparrows Point in compliance with the proposed Final Judgment.

## II.    Compliance with the APPA

The APPA requires a sixty-day period for the submission of public comments on a proposed Final Judgment. *See* 15 U.S.C. § 16(b). In compliance with the APPA, the United States filed the CIS in this Court on August 1, 2006; published the CIS in the *Federal Register* on August 24, 2006, *see United States v. Mittal Steel Company N.V.*, 71 Fed. Reg. 50084, 2006 WL 2431068; and published summaries of the terms of the proposed Final Judgment and CIS, together with directions for the submission of written comments relating to the proposed Final Judgment, in *The Washington Post* for seven days beginning on September 10, 2006 and ending on September 16, 2006.

The sixty-day period for public comments ended on November 15, 2006; and three comments were received. The United States filed the comments and the Response to Public Comments on February 13, 2007, and published both in the *Federal Register* on April 9, 2007. *United States v. Mittal Steel Company N.V.*, 72 Fed. Reg.17634, 2007 WL 1036107. The Certificate of Compliance filed simultaneously with this Motion recites that all the requirements of the APPA have now been satisfied. It is therefore appropriate for the Court to make the public interest determination required by 15 U.S.C. § 16(e) and to enter the Final Judgment.

## III.    Standard of Judicial Review Under the APPA for the Proposed Final Judgment

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court shall consider:

6

(A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties.  *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995).

    With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public."  *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62.  Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3]  In making its public interest

determination, a district court must accord due respect to the government's prediction as to the

effect of proposed remedies, its perception of the market structure, and its views of the nature of

the case.  *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003).

      Court approval of a final judgment requires a standard that is more flexible and less strict

than the standard required for a finding of liability.  "[A] proposed decree must be approved even

if it falls short of the remedy the court would impose on its own, as long as it falls within the

range of acceptability or is 'within the reaches of public interest.'"  *United States v. Am. Tel. &*

*Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v.*

*Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*,

460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622

(W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a

greater remedy).  The Court "must accord deference to the government's predictions about the

efficacy of its remedies, and may not require the remedies to perfectly match the alleged

violations because this may only reflect underlying weaknesses in the government's case or

concessions made during negotiations." *United States v. SBC Commc'ns, Inc.*, Nos. 05-2102 and

05-2103, 2007 WL 1020746, at *16 (D.D.C. Mar. 29, 2007).

---

    [3] *Cf. BNS*, 858 F.2d at 463 (holding that the court's "ultimate authority under the [APPA]
is limited to approving or disapproving the consent decree"); *Gillette*, 406 F. Supp. at 716 (noting
that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor
with a microscope, but with an artist's reducing glass").  *See generally Microsoft*, 56 F.3d at
1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the
allegations charged as to fall outside of the 'reaches of the public interest'").

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id*. at 1459-60. As this Court recently confirmed in *SBC Commc'ns*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, at *14.

In 2004, Congress amended the APPA to ensure that courts take into account the above-quoted list of relevant factors when making a public interest determination. *Compare* 15 U.S.C. § 16(e) (2004) *with* 15 U.S.C. § 16(e)(1) (2006) (substituting "shall" for "may" in directing relevant factors for court to consider and amending list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms). These amendments, however, did not change the fundamental role of courts in reviewing proposed settlements. To the contrary, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16 (e)(2). This language codified the intent of the original 1974 statute, expressed by Senator Tunney in the legislative history: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the

9

effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather:

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.

*United States v. Mid-America Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977).

This Court recently examined the role of the district court in reviewing proposed final judgments in light of the 2004 amendments, confirming that the amendments "effected minimal changes[] and that this Court's scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." See *SBC Commc'ns*, at *9. This Court concluded that the amendments did not alter the articulation of the public interest standard in *Microsoft*. *Id.* at *15.

In this case, the United States has made the necessary showing that entry of the proposed Final Judgment is in the public interest. *See* CIS and the Response to Public Comments. The public, including affected competitors and customers, has had the opportunity to comment on the proposed Final Judgment as required by law. The proposed Final Judgment is within the range of settlements consistent with the public interest.

**IV.    Conclusion**

For the reasons set forth in this Motion, the CIS, and the Response to Public Comments, the Court should find that the proposed Final Judgment is in the public interest and should enter the proposed Final Judgment without further hearings.  The United States respectfully requests that the proposed Final Judgment be entered as soon as possible.


Dated: April 20, 2007                              Respectfully submitted,

                                                   _____
                                                   LOWELL R. STERN
                                                   (D.C. Bar No. 440487)
                                                   Trial Attorney
                                                   United States Department of Justice
                                                   Antitrust Division
                                                   Litigation II Section
                                                   1401 H Street, N.W., Suite 3000
                                                   Washington, DC 20530
                                                   Telephone: (202) 307-0924
                                                   Facsimile: (202) 307-6283

## CERTIFICATE OF SERVICE

I hereby certify that on the _____ day of April 2007, I caused a copy of the foregoing

Plaintiff United States's Motion and Memorandum for Entry of Proposed Final Judgment to

be mailed, by U.S. mail, postage prepaid, to the attorneys listed below:

_____
Lowell R. Stern

For Mittal Steel Company N.V.:

Mark Leddy, Esquire
Brian Byrne, Esquire
Jeremy J. Calsyn, Esquire
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, D.C.  20006