**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>    *Plaintiff,*    )<br><br>       v.       )<br><br>MITTAL STEEL COMPANY N.V.,  )<br><br>       )<br><br>    *Defendant.*    ) | Case No.<br><br>DECK TYPE: Antitrust<br><br>DATE STAMP: |

## FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on August 1, 2006

and plaintiff and defendant, Mittal Steel Company N.V., by their respective attorneys, have

consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or

law, and without this Final Judgment constituting any evidence against or admission by any party

regarding any issue of fact or law;

AND WHEREAS, defendant agrees to be bound by the provisions of this Final Judgment

pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture

of certain rights or assets by the defendant to assure that competition is not substantially lessened;

AND WHEREAS, plaintiff requires defendant to make certain divestitures for the purpose

of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, defendant has represented to the United States that the divestitures

required below can and will be made and that defendant will later raise no claim of hardship or

difficulty as grounds for asking the Court to modify any of the divestiture provisions contained

below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any

issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND

DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter of and each of the parties to this action.

The Complaint states a claim upon which relief may be granted against defendant under Section 7

of the Clayton Act, as amended, 15 U.S.C. § 18.

## II. Definitions

As used in this Final Judgment:

A.    "Acquirer" means the entity or entities to whom defendant divests either the

Dofasco Business or the Selected Business.

B.    "Arcelor" means Arcelor, S.A., a Luxembourg corporation with its headquarters in

Luxembourg City, Luxembourg, its successors and assigns, and its subsidiaries, divisions, groups,

affiliates, partnerships, joint ventures, and their directors, officers, managers, agents, and

employees.

C.    "Divested Business" means either the Dofasco Business or the Sparrows Point

Business or the Weirton Business, whichever is being offered for sale by the defendant or by a

trustee appointed pursuant to Section V of this Final Judgment.

D.    "Dofasco Business" means all assets, interests, and rights in Dofasco Inc.

2

("Dofasco"), including any additions, improvements, or expansions made by Arcelor after Arcelor's acquisition of Dofasco on or about February 20, 2006, and includes but is not limited to:

1.  all tangible assets that comprise Dofasco, including research and development activities, all manufacturing equipment, tooling and fixed assets, personal property, inventory, office furniture, materials, supplies, on- or off-site warehouses or storage facilities and other tangible property, and all assets used exclusively in connection with the Dofasco business; all licenses, permits and authorizations issued by any governmental organization relating to Dofasco; all supply agreements relating to Dofasco; all contracts, teaming agreements, agreements, leases, certifications, commitments, and understandings; all customer contracts, lists, accounts, and credit records relating to Dofasco; and all other records relating to Dofasco;

2.  all intangible assets used in the development, production, servicing, and sale of products by Dofasco, including but not limited to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names, technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information provided to

3

the employees, customers, suppliers, agents or licensees of Dofasco; all research data concerning historic and current research and development efforts relating to products produced or sold by Dofasco, including but not limited to designs of experiments, and the results of successful and unsuccessful designs and experiments, provided, however, that Dofasco does not include Dofasco's interest in Sorevco.

E.    "DoSol Joint Venture" means DoSol Galva Limited Partnership, the hot dip galvanizing facility located in Hamilton, Ontario, Canada, that is a joint venture between Dofasco and Arcelor.

F.    "Mittal Steel" means defendant Mittal Steel Company, N.V., a Netherlands public limited liability company with its headquarters in Rotterdam, The Netherlands, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, joint ventures, and their directors, officers, managers, agents, and employees.

G.    "QCM" means Quebec Cartier Mining Company, a producer of iron ore products, headquartered in Montreal, Quebec, Canada.

H.    "Selected Business" means whichever of the Sparrows Point Business or the Weirton Business is selected by the United States in its sole discretion to be offered for sale by the defendant or by a trustee appointed pursuant to Section V of this Final Judgment.

I.    "Sorevco" mean Sorevco and Company, Limited, the hot dip galvanizing operation located in Montreal, Quebec, Canada, that is a joint venture between Dofasco and Mittal.

J.    "Sparrows Point Facility" means the steel making, rolling, and coating facility owned by Mittal Steel and located in or near Sparrows Point, Maryland.

K.    "Sparrows Point Business" means all assets, interests, and rights in the Sparrows Point Facility, and includes but is not limited to:

1.    all tangible assets used in the development, production, servicing, and sale of all products produced at the Sparrows Point Facility, including but not limited to all real property; any facilities used for research, development, and engineering support, and any real property associated with those facilities; manufacturing and sales assets, including all manufacturing equipment, tooling and fixed assets, capital equipment, vehicles, supplies, personal property, inventory, office furniture, fixed assets and fixtures, materials, on- or off-site warehouses or storage facilities, and other tangible property or improvements; all licenses, permits and authorizations issued by any governmental organization relating to the Sparrows Point Business; supply agreements; all contracts, teaming agreements, agreements, leases, certifications, commitments, and understandings relating to the Sparrows Point Business; all customer contracts, lists, accounts, and credit records; and all other records maintained by Mittal Steel in connection with the operation of the Sparrows Point Business; provided, however, that with respect to any assets covered by Section II(K)(1) that relate primarily to Mittal's non-divested businesses, but also relate in part to the Sparrows Point Business, the defendant shall have the option, subject to the written approval of the United States in its sole discretion, to substitute equivalent assets or arrangements (a substituted asset or arrangement will not be

5

deemed equivalent unless it provides the Sparrows Point Business the same

benefits, or enables the Sparrows Point Business to perform the same

function at the same or less cost); and further provided, that the Sparrows

Point Business does not include Mittal Steel's contract to supply hot-rolled

steel to the The Ford Motor Company, which contract is supplied in part by

the Sparrows Point Facility;

2.  all intangible assets currently used exclusively or primarily in the

development, production, servicing, and sale of all products produced at the

Sparrows Point Facility, including but not limited to all patents, licenses and

sublicenses, intellectual property, copyrights, trademarks, trade names,

service marks, service names (except to the extent such trademarks, trade

names, service marks, or service names contain the trademark or name

"Mittal Steel" or any variation thereof), technical information, computer

software and related documentation, know-how, trade secrets, drawings,

blueprints, designs, design protocols, specifications for materials,

specifications for parts and devices, safety procedures for the handling of

materials and substances, quality assurance and control procedures, design

tools and simulation capability, and all manuals and technical information

provided to the employees, customers, suppliers, agents or licensees of the

Sparrows Point Business;

3.  with respect to any other identified intangible assets that are not subject to

Section II(K)(2) and that prior to the filing of the Complaint were used both

in connection with the Sparrows Point Business and in connection with Mittal Steel's non-divested businesses, the defendant shall provide to the Acquirer a non-exclusive, non-transferable, fully-paid-up license(s) for such intangible asset(s) to the extent and for the period of time that defendant has rights to such intangible assets, provided, however, that any such license may be transferable to any future purchaser of the Sparrows Point Business; and

4.   all research data concerning historic and current research and development efforts related to the Sparrows Point Business, including but not limited to designs of experiments, and the results of successful and unsuccessful designs and experiments.  To the extent that any such data also relates to historic and current research and development efforts related to businesses other than the Sparrows Point Business, providing a non-exclusive copy of such data shall fulfill defendant's obligations under this provision.

L.   "ThyssenKrupp" means ThyssenKrupp AG, a German corporation with its headquarters in Dusseldorf, Germany, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, joint ventures, and their directors, officers, managers, agents, and employees.

M.   "Tin Mill Products" means collectively black plate, *i.e.*, light-gauge cold-rolled bare steel sheet; electrolytic tin plate, *i.e.*, black-plate electrolytically coated with tin; and tin free steel, *i.e.,* black plate electrolytically coated with chromium.

7

N.    "Weirton Facility" means the steel making, rolling, and coating facility owned by Mittal Steel and located in or near Weirton, West Virginia.

O.    "Weirton Business" means all assets, interests, and rights in Weirton Facility, and includes but is not limited to:

1.    all tangible assets used in the development, production, servicing, and sale of all products produced at the Weirton Facility, including but not limited to all real property; any facilities used for research, development, and engineering support, and any real property associated with those facilities; manufacturing and sales assets, including all manufacturing equipment, tooling and fixed assets, capital equipment, vehicles, supplies, personal property, inventory, office furniture, fixed assets and fixtures, materials, on- or off-site warehouses or storage facilities, and other tangible property or improvements, including but not limited to all of defendant's rights and interests in the Half Moon tin warehouse and processing facility near the Weirton Facility; all licenses, permits and authorizations issued by any governmental organization relating to the Weirton Facility; supply agreements; all contracts, teaming agreements, agreements, leases, certifications, commitments, and understandings relating to the Weirton Facility; all customer contracts, lists, accounts, and credit records; and all other records maintained by Mittal Steel in connection with the operation of the Weirton Business; provided, however, that with respect to any assets covered by Section II(O)(1) that relate primarily to Mittal's non-divested

8

businesses, but also relate in part to the Weirton Business, the defendant shall have the option, subject to the written approval of the United States in its sole discretion, to substitute equivalent assets or arrangements (a substituted asset or arrangement will not be deemed equivalent unless it provides the Weirton Business the same benefits, or enables the Weirton Business to perform the same function at the same or less cost);

2.     all intangible assets currently used exclusively or primarily in the development, production, servicing, and sale of all products produced at the Weirton Facility, including but not limited to all patents, licenses and sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service names (except to the extent such trademarks, trade names, service marks, or service names contain the trademark or name "Mittal Steel" or any variation thereof), technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information provided to the employees, customers, suppliers, agents or licensees of the Weirton Business;

3.     with respect to any other identified intangible assets that are not subject to Section II(O)(2) and that prior to the filing of the Complaint were used both

9

in connection with the Weirton Business and in connection with Mittal

Steel's non-divested businesses, the defendant shall provide to the Acquirer

a non-exclusive, non-transferable, fully paid-up license(s) for such

intangible asset(s) to the extent and for the period of the time that defendant

has rights to such intangible assets, provided, however, that any such license

may be transferable to any future purchaser of the Weirton Business; and

4.    all research data concerning historic and current research and

development efforts related to the Weirton Business, including but not

limited to designs of experiments, and the results of successful and

unsuccessful designs and experiments. To the extent that any such data also

relates to historic and current research and development efforts related to

businesses other than the Weirton Business, providing a non-exclusive copy

of such data shall fulfill defendant's obligations under this provision.

## III. Applicability

A.    This Final Judgment applies to Mittal Steel, as defined above, and all other persons

in active concert or participation with Mittal Steel who receive actual notice of this Final

Judgment by personal service or otherwise.

B.    Defendant shall require, as a condition of the sale or other disposition of all or

substantially all of its assets or of lesser business units that includes the Divested Business, that the

purchaser agrees to be bound by the provisions of this Final Judgment.

## IV. Divestiture

A.    In the event defendant acquires Arcelor, defendant is ordered and directed to divest

10

the Dofasco Business to ThyssenKrupp within (1) 120 calendar days after the filing of the

Complaint in this matter or (2) five (5) days after notice of the entry of this Final Judgment by the

Court, whichever is later.  The United States, in its sole discretion, may agree to one or more

extensions of this time period, not to exceed in total sixty (60) calendar days, and shall notify the

Court in each such circumstance.  At its option, defendant may elect to sell Dofasco to an

alternative Acquirer acceptable to the United States in the sole discretion of the United States.

Defendant agrees to use its best efforts to divest the Dofasco Business as expeditiously as

possible.

B.      In the event defendant acquires Arcelor but is unable to accomplish the divestiture

of the Dofasco Business within the time period specified in Section IV(A), then at the option of the

United States, defendant shall divest either the Sparrows Point Business or the Weirton Business.

The United States shall provide defendant written notice of its selection.  Defendant is ordered and

directed, within ninety (90) calendar days of the receipt of such notice, to divest the Selected

Business in a manner consistent with this Final Judgment to an Acquirer acceptable to the United

States in its sole discretion.  The United States, in its sole discretion, may agree to one or more

extensions of this time period, not to exceed in total sixty (60) calendar days, and shall notify the

Court in each such circumstance.  Defendant agrees to use its best efforts to divest the Selected

Business as expeditiously as possible.  Once the United States has provided defendant with written

notice of its selection under Section IV(B), the defendant will cease to have any obligation under

Section IV(A) to divest the Dofasco Business.

C.      In accomplishing the divestiture ordered by the Final Judgment, defendant promptly

shall make known, by usual and customary means, the availability of the Divested Business.

11

Defendant shall inform any person making inquiry regarding a possible purchase of the Divested Business that it will be divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendant shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divested Business that customarily are provided in a due diligence process except such information or documents subject to the attorney-client or work-product privilege. Defendant shall make available such information to the United States at the same time that such information is made available to any other person.

D.    Defendant shall provide the Acquirer and the United States information relating to personnel involved in the research, development, production, operation, and sale of the products of the Divested Business to enable the Acquirer to make offers of employment. Defendant will not interfere with any negotiations by the Acquirer to employ any employee of the Divested Business whose primary responsibility is the production, operation, development, or sale of the products of the Divested Business.

E.    Defendant shall permit prospective Acquirers of the Divested Business to have reasonable access to personnel and to make inspections of the physical facilities of the Divested Business; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, and other documents and information customarily provided as part of a due diligence process.

F.    Defendant shall warrant to the Acquirer of the Divested Business that each asset of the Divested Business is in a condition and state of repair equal to the condition and state of repair as of, (1) in the case that the Selected Business is divested, the date the defendant publicly

12

announced its intention to acquire Arcelor, *i.e.*, January 27, 2006, or (2) in the case that the Dofasco Business is divested, the date of the filing of the Complaint in this matter.

G.    Defendant shall not take any action that will impede in any way the permitting, operation, or divestiture of the Divested Business.

H.    The defendant will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Divested Business. If the Selected Business is divested, the defendant shall warrant to the Acquirer of the Selected Business that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Selected Business as operated by the defendant.

I.    Nothing in this Final Judgment shall be construed to require the Acquirer as a condition of any license granted by defendant pursuant to Sections II(K)(3) or II(O)(3) to extend to defendant the right to use the Acquirer's improvements to processes used in connection with the Selected Business.

J.    Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire business and assets of the Divested Business, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divested Business can and will be used by the Acquirer as a viable, ongoing business engaged in producing Tin Mill Products. The divestiture, whether pursuant to Section IV or Section V of this Final Judgment,

1.    shall be made to an Acquirer that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) to

13

compete effectively in the production and sale of Tin Mill Products; and

2.      shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer and defendant gives defendant the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise interfere in the ability of the Acquirer to compete effectively in the production and sale of Tin Mill Products.

## V. <u>Appointment of Trustee to Effect Divestiture</u>

A.      If the defendant has not divested the Selected Business pursuant to Section IV(B) of this Final Judgment within the time period specified in that Section, defendant shall notify the United States of that fact in writing.  Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Selected Business pursuant to Section IV(B).

B.      After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Selected Business.  The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Section V(D) of this Final Judgment, the trustee may hire at the cost and expense of defendant any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

14

C.    Defendant shall not object to a sale by the trustee on any ground other than the trustee's malfeasance.  Any such objection by defendant must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D.    The trustee shall serve at the cost and expense of defendant, on such terms and conditions as plaintiff approves, and shall account for all monies derived from the sale of the Selected Business all costs and expenses so incurred.  After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to defendant and the trust shall then be terminated.  The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Selected Business and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.    Defendant shall use its best efforts to assist the trustee in accomplishing the required divestiture.  The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the Selected Business, and defendant shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to customary confidentiality protection for trade secret or other confidential research, development, or commercial information.  Defendant shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F.    After its appointment, the trustee shall file monthly reports with the United States

15

and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this

Final Judgment. To the extent such reports contain information that the trustee deems confidential,

such reports shall not be filed in the public docket of the Court. Such reports shall include the

name, address, and telephone number of each person who, during the preceding month, made an

offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was

contacted or made an inquiry about acquiring the Selected Business, and shall describe in detail

each contact with any such person. The trustee shall maintain full records of all efforts made to

divest the Selected Business.

        G.      If the trustee has not accomplished the divestiture of the Selected Business within

six months after its appointment, the trustee shall promptly file with the Court a report setting forth

(1) the trustee's efforts to accomplish the required divestiture; (2) the reasons, in the trustee's

judgment, why the required divestiture has not been accomplished; and (3) the trustee's

recommendations. To the extent such report contains information that the trustee deems

confidential, such report shall not be filed in the public docket of the Court. The trustee shall at the

same time furnish such report to the plaintiff, who shall have the right to make additional

recommendations consistent with the purpose of the trust. The Court thereafter shall enter such

orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if

necessary, include extending the trust and the term of the trustee's appointment by a period

requested by the United States.

## VI. Notice of Proposed Divestiture

        A.      Within two (2) business days following execution of a definitive divestiture

agreement, defendant or the trustee, whichever is then responsible for effecting the divestiture

required herein, shall notify the United States of any proposed divestiture required by Section IV or V of this Final Judgment. If the trustee is responsible, it shall similarly notify defendant. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Selected Business.

B.     Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from defendant, the proposed Acquirer, any other third party, or the trustee if applicable additional information concerning the proposed divestiture, the proposed Acquirer, and any other potential Acquirer. Defendant and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.     Within (a) thirty (30) calendar days after receipt of the notice or (b) twenty (20) calendar days after the United States has been provided the additional information requested from defendant, the proposed Acquirer, any third party, or the trustee, whichever is later, the United States shall provide written notice to defendant and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to defendant's limited right to object to the sale under Section V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendant under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

17

## VII. <u>Financing</u>

Defendant shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

## VIII. <u>Hold Separate</u>

Until the divestiture required by this Final Judgment has been accomplished defendant shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendant shall take no action that would jeopardize the divestiture order by this Court.

## IX. <u>Affidavits</u>

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or V, defendant shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divested Business, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendant has taken to solicit buyers for the Divested Business, and to provide required information to any prospective Acquirer, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendant, including limitations on the information, shall be made within fourteen (14) calendar days of receipt of such

affidavit.

B.     Within twenty (20) calendar days of the filing of the Complaint in this matter, defendant shall deliver to the United States an affidavit that describes in reasonable detail all actions defendant has taken and all steps defendant has implemented on an ongoing basis to comply with Section VIII of this Final Judgment.  Defendant shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendant's earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.     Defendant shall keep all records of all efforts made to preserve and divest the Divested Business until one year after a divestiture has been completed.

## X. Compliance Inspection

A.     For purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendant, be permitted:

1.     access during defendant's office hours to inspect and copy, or at plaintiff's option, to require defendant to provide copies of, all books, ledgers, accounts, records and documents in the possession, custody, or control of defendant, relating to any matters contained in this Final Judgment; and

2.     to interview, either informally or on the record, defendant's officers, employees, or agents, who may have their individual counsel present,

regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by defendant.

B.     Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendant shall submit written reports, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.     If, at the time information or documents are furnished by defendant to the United States, defendant represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26 (c)(7) of the Federal Rules of Civil Procedure, and defendant mark each pertinent page of such material, "Subject to claim of protection under Rule 26 (c)(7) of the Federal Rules of Civil Procedure," then the United States shall give defendant ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI.  No Reacquisition

Defendant may not reacquire any part of any assets divested during the term of this Final Judgment, provided, however, that nothing in this decree shall prevent defendant from (1) reaquiring any of the assets of QCM, subject to the written consent of the United States in its sole discretion; or (2) increasing its interest in the DoSol Joint Venture to 50 percent.

## XII.  Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII.  Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XIV.  Public Interest Determination

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

21

Date: _____

Court approval subject to procedures of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16.

_____
United States District Judge